IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

MICHAEL YARBROUGH, JR., ANN YARBROUGH AND
ALIZELYIA YARBROUGH, MICHAEL YARBROUGH, III
AND JAMES YARBROUGH, MINORS,
BY AND THROUGH THEIR NATURAL GUARDIANS,
MICHAEL YARBROUGH, JR. AND ANN YARBROUGH

PLAINTIFFS

VERSUS

CAUSE NO. A2402-2017-159

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z

DEFENDANTS

## SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:     Hunt Southern Group, LLC fka Forest City Southern Group, LLC
        c/o Registered Agent
        Capitol Corporate Services, Inc.
        248 E. Capitol Street, Suite 840
        Jackson, Mississippi 39201
        OR WHEREEVER THEY MAY BE FOUND

## NOTICE TO DEFENDANT(S)

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU
MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi, Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2ⁿᵈ Floor, Ocean Springs, Mississippi 39564**. Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of December, 2017.

Connie Ladner _____ Clerk

BY: _____ D.C.

EXHIBIT

A

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

**MICHAEL YARBROUGH, JR., ANN YARBROUGH AND
ALIZELYIA YARBROUGH, MICHAEL YARBROUGH, III
AND JAMES YARBROUGH, MINORS,
BY AND THROUGH THEIR NATURAL GUARDIANS,
MICHAEL YARBROUGH, JR. AND ANN YARBROUGH**          **PLAINTIFFS**

**VERSUS**                                                   CAUSE NO. A2402-2017-159

**HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z**          **DEFENDANTS**

### COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Michael Yarbrough, Jr., Ann Yarbrough and Alizelyia
Yarbrough, Michael Yarbrough, III and James Yarbrough, Minors, by and through their natural
guardians, Michael and Ann Yarbrough (Plaintiffs), by and through their attorneys, Rushing &
Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest City
Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property
Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate
Entities N through Z (Defendants), and for good cause of action, states unto the Court the
following, to-wit:

FILED

DEC 22 2017

CONNIE LADNER
CIRCUIT CLERK
BY:_____ D.C.

## PARTIES

1.

Plaintiff, Michael Yarbrough, Jr., ("Michael"), is an adult citizen of Harrison County, Mississippi residing at 295 Fairchild Drive, Biloxi, Mississippi.

2.

Plaintiff, Ann Yarbrough ("Ann"), is an adult citizen of Harrison County, Mississippi residing at 295 Fairchild Drive, Biloxi, Mississippi.

3.

Plaintiff, Alizelyia Yarbrough ("Alizelyia"), is the minor child of Michael and Ann, her natural guardians, born July 11, 2007, and is a resident of the State of Mississippi, residing at 295 Fairchild Drive, Biloxi, Mississippi.

4.

Plaintiff, Michael Yarbrough, III ("Michael III"), is the minor child of Michael and Ann, his natural guardians, born July 22, 2013, and is a resident of the State of Mississippi, residing at 295 Fairchild Drive, Biloxi, Mississippi.

5.

Plaintiff, James Yarbrough ("James"), is the minor child of Michael and Ann, his natural guardians, born September 11, 2016, and is a resident of the State of Mississippi, residing at 295 Fairchild Drive, Biloxi, Mississippi.

6.

Defendant, Hunt Southern Group, LLC (Hunt Southern), fka Forest City Southern Group, LLC (Forest City Southern), is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of

Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

7.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

8.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

9.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

10.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

11.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

12.

Ann is a Technical Sergeant with the United States Air Force. In September of 2011, after Ann was stationed at Keesler Air Force Base, Plaintiffs moved to Biloxi, Mississippi. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendants.

13.

Plaintiffs signed a Military Lease Agreement with Defendants on September 23, 2011. Plaintiffs were assigned military housing at 295 Fairchild Drive in Biloxi, Mississippi in the County of Harrison (Subject Property). See Military Lease Agreement Attached hereto as

Exhibit "A." Plaintiffs moved into the Subject Property in September of 2011. The Subject Property is located in the West Falcon Park Neighborhood, which is military housing specifically for Junior Enlisted (E1-E6). West Falcon Park is comprised of approximately 140 homes and is located near Keesler Air Force Base. At all times mentioned herein, the Subject Property was owned, controlled or managed by Defendants.

14.

At the time Plaintiffs entered into the Military Lease Agreement, West Falcon Park was owned and operated by Defendants. Defendants exercised custody and control over West Falcon Park and acted as the owners of West Falcon Park through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

15.

While residing in the Subject Property, Plaintiffs reported several maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was later learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the subject property. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses it operates.

16.

Plaintiffs repeatedly requested that Defendants address the mold and leaking problems while they lived in the Subject Property. Rather than removing the mold, Defendants simply cleaned it with soap and water. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided at West Falcon Park, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

17.

On March 22, 2017, testing was performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with less being found outside the Subject Property. These elevated levels of toxic mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

18.

Plaintiffs have obtained information from other military housing families which leads them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in West Falcon Park.

19.

As a direct result of the continued exposure to toxic mold located in the Subject Property, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical

injuries, medical expenses and property damage. They also suffered property loss due to mold contamination and have not been compensated for any of their losses.

20.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

21.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

22.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and

mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

### 23.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 22.

### 24.

Defendants, as owners and/or managers of West Falcon Park:

A.    Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.    Negligently failed to pay for relocation expenses and caused Plaintiffs to pay for the moving expenses;

C.    Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.    Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.    Negligently managed and maintained West Falcon Park;

F.    Negligently supervised their employees, agents and/or representatives;

G.    Negligently trained and supervised their employees, agents and/or representatives;

H.    Negligently inspected West Falcon for dangerous and harmful conditions;

I.    Negligently remediated the toxic mold contained in the Subject Property;

J.    Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.    Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.    Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.    Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

25.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT II

## GROSS NEGLIGENCE

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

28.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on September 23, 2011. The contract was breached for the following reasons:

A.   Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.   Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.   The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.  Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.  Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.  Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.  Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation." Plaintiffs shouldered the entire cost of the relocation.

31.

As a direct and proximate result of Defendants breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

### 32.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 31.

### 33.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 34.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 33.

### 35.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

### 36.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 35.

### 37.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.      Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.      Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.      Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.      Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.      Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

38.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 37.

39.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

40.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 39.

41.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

42.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 41.

43.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which was repeated until Plaintiffs moved out of the Subject Property.

## DISABILITY OF INFANCY

44.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 43.

45.

Alizelyia, Michael III, and James are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

46.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 45.

47.

As a direct and proximate result of Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Michael Yarbrough. Jr, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset. losses and damage to his quality of life, and mental and emotional well-being,

reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Ann Yarbrough, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Alizelyia Yarbrough, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

D. Plaintiff, Michael Yarbrough III, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for; and

E. Plaintiff, James Yarbrough, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

### 48.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 47.

### 49.

At all times mentioned herein. Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 50.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 49.

### 51.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

MICHAEL YARBROUGH, JR., ANN
YARBROUGH AND ALIZELYIA
YARBROUGH, MICHAEL YARBROUGH, III
AND JAMES YARBROUGH, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, MICHAEL YARBROUGH, JR.,
AND ANN YARBROUGH, PLAINTIFFS

BY:

WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS 39533
TELEPHONE: (228) 374-2313
FAX: (228) 875-5987
ATTORNEYS FOR PLAINTIFFS

Installation: <u>Keesler Air Force Base</u>
Forest City Southern Group, LLC
Neighborhood Management Office
303 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

# MILITARY LEASE AGREEMENT

1. Lease Agreement Date:   September 23, 2011

2. Resident(s)          100 16368          Pay Grade:

    Ann M Wilson                          E05

3. Other Occupants:

    Alizelyia Wilson

4. Lease Term:
    a. Commencement Date:        October 1, 2011
    b. Expiration Date:          September 30, 2012

5. Neighborhood:   West Falcon Park

6. Premises Address:                        0295 FAIR
    295 Fairchild Dr
    Biloxi, MS 39531

7. Monthly Rent:                            $1,164.00

8. Partial Month Rent:

9. Partial Month Rent Due Date:

10. Security Deposit:

11. Late Charge: $50.00 as specified in Paragraph 5

11. Late Charge: $50.00 as specified in Paragraph 5

12. Returned Check: $35 as specified in Paragraph 5

Resident agrees to pay Rent to Owner by monthly electronic Allotment. Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement. Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated

This Lease Agreement is a legally binding contract. Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement. The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident. Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC

By Authorized Representative: _____               9/23/11
                                                                        Date

Resident: _____  23 Sep 11          Resident: _____
                             Date                                      Date

Addenda:
☐   Community Handbook                ☐   Other:
     Dated 09-11                      ☐   Other:
☐   Mold Addendum                     ☐   Other:
☐   Third Party Allotment Addendum    ☐   Other:
☐   Pet Addendum                      ☐   Other:
☐   Current Resident Addendum



EXHIBIT
A

# CURRENT RESIDENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated ___9/23/11___ (the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and __Anna Wilson__ ("Resident") regarding property located at __225 Fairchild__ (the "Premises").

1. **Acknowledgment of Residence.** Owner and Resident acknowledge that Resident occupied the Premises on and prior to the Lease Signature Date, and Resident shall continue to reside in the Premises under the Lease Agreement.

2. **Amendments to Lease Agreement.** Owner and Resident agree to the following amendments to the Lease Agreement:

    a. The first paragraph of Section 3 is amended to read: "This Lease Agreement shall be for the term beginning on the Lease Commencement Date specified on Page 1 Number 4a and terminating on the Lease Expiration Date specified on Page 1 Number 4b (the "Term"). If the Term is for twelve (12) months, Owner reserves the right to extend the Lease Commencement Date to a date no later than December 1, 2011, and to delay the Lease Expiration Date to twelve (12) months after the delayed Lease Commencement Date. For Owner to delay the dates of the Term, Owner must notify Resident of the delayed Lease Commencement Date and delayed Lease Expiration Date prior to the Lease Commencement Date on Page 1 Number 4a. Owner's notification to Resident shall be by certified mail, return receipt requested. In such event, the Lease Agreement shall commence on the delayed Lease Commencement Date and terminate on the delayed Lease Expiration Date."

    b. The following sentence is added to the end of the first sentence in the first paragraph in Section 4: "As of the Lease Commencement Date, if Resident is occupying a Premises that is in a Housing Category above the Resident's military rank, the Monthly Rent shall be based on the BAH with dependents rate of the military grade of the Resident (or senior service member in multiple member households)."

    c. The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

    d. Section 6 is amended to read: "Resident acknowledges that he/she is in possession of the Premises on the Lease Commencement Date and accept the Premises "as is" as of the date Resident originally commenced occupancy of the Premises, which condition is described in Resident's original move-in condition form, a copy of which is on file with Owner and will be provided to Resident upon request. However, Resident reserves the right to inform Owner of any change in condition from Resident's original move-in date to the Lease Commencement Date ("Change in Condition") that was not the responsibility of Resident. Resident must submit any Change in Condition information to Owner within thirty (30) days of the Lease Commencement Date. Owner may inspect the Premises to validate the Change in Condition. If both parties agree, then the Change in Condition will be documented and Resident will not be responsible to remedy the Change of Condition at move-out."

e.  The first sentence the second paragraph of Section 10 is amended and expanded to read: "A pet deposit will not be required for pets on the Premises on or prior to the Lease Commencement Date. For pets acquired after that time, a refundable pet deposit will be required, which will be used by the Owner as necessary for any cleaning and/or damages caused by the pet(s) after Resident vacates the Premises."

f.  The following sentence is added to the end of Section 10: "On the Lease Signature Date, if Resident has more than two (2) pet mammals on the Premises, then Resident may keep all of those pets as long as Resident executes a Pet Addendum with Owner that lists each pet.

g.  Section 28a(iv) is amended to read: "clean and deliver the Premises to Owner in the same condition as it was delivered upon the original commencement of tenancy, less ordinary wear and tear, following the cleaning requirements for move-out in Exhibit A of the Community Handbook."

Resident:

Date:  23 Sep 11

Forest City Residential Management, Inc.
Agent for Owner

By:

Date:

Installation: <u>Keesler Air Force Base</u>
Forest City Southern Group, LLC
Neighborhood Management Office
303 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

## MILITARY LEASE AGREEMENT

1. Lease Agreement Date:   September 23, 2011

2. Resident(s)   t0046368   Pay Grade:

   Ann M Wilson   E05

3. Other Occupants:

   Alizelyia Wilson

4. Lease Term:
   a. Commencement Date:   October 1, 2011

   b. Expiration Date:   September 30, 2012

5. Neighborhood:   West Falcon Park

6. Premises Address:   0295FAIR
   295 Fairchild Dr
   Biloxi, MS 39531

7. Monthly Rent:   $1,164.00

8. Partial Month Rent:

9. Partial Month Rent Due Date:

10. Security Deposit:

11. Late Charge: $50.00 as specified in Paragraph 5

11. Late Charge: $50.00 as specified in Paragraph 5

12. Returned Check: $35 as specified in Paragraph 5

Resident agrees to pay Rent to Owner by monthly electronic Allotment. Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement. Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated.

This Lease Agreement is a legally binding contract. Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement. The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident. Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC.

By Authorized Representative: _____   9/23/11
Date

Resident: _____   23 Sep 11   Resident: _____
Date   Date

**Addenda:**

☐   Community Handbook   ☐   Other:
    Dated 09/11   ☐   Other:
☐   Mold Addendum   ☐   Other:
☐   Third Party Allotment Addendum   ☐   Other:
☐   Pet Addendum   ☐   Other:
☐   Current Resident Addendum

EQUAL HOUSING OPPORTUNITY

# CURRENT RESIDENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_ (the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and _Ann Wilson_ ("Resident") regarding property located at _245 Fairchild_ (the "Premises").

1. **Acknowledgment of Residence.** Owner and Resident acknowledge that Resident occupied the Premises on and prior to the Lease Signature Date, and Resident shall continue to reside in the Premises under the Lease Agreement.

2. **Amendments to Lease Agreement.** Owner and Resident agree to the following amendments to the Lease Agreement:

   a. The first paragraph of Section 3 is amended to read: "This Lease Agreement shall be for the term beginning on the Lease Commencement Date specified on Page 1 Number 4a and terminating on the Lease Expiration Date specified on Page 1 Number 4b (the "Term"). If the Term is for twelve (12) months, Owner reserves the right to extend the Lease Commencement Date to a date no later than December 1, 2011, and to delay the Lease Expiration Date to twelve (12) months after the delayed Lease Commencement Date. For Owner to delay the dates of the Term, Owner must notify Resident of the delayed Lease Commencement Date and delayed Lease Expiration Date prior to the Lease Commencement Date on Page 1 Number 4a. Owner's notification to Resident shall be by certified mail, return receipt requested. In such event, the Lease Agreement shall commence on the delayed Lease Commencement Date and terminate on the delayed Lease Expiration Date."

   b. The following sentence is added to the end of the first sentence in the first paragraph in Section 4: "As of the Lease Commencement Date, if Resident is occupying a Premises that is in a Housing Category above the Resident's military rank, the Monthly Rent shall be based on the BAH with dependents rate of the military grade of the Resident (or senior service member in multiple member households)."

   c. The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

   d. Section 6 is amended to read: "Resident acknowledges that he/she is in possession of the Premises on the Lease Commencement Date and accept the Premises "as is" as of the date Resident originally commenced occupancy of the Premises, which condition is described in Resident's original move-in condition form, a copy of which is on file with Owner and will be provided to Resident upon request. However, Resident reserves the right to inform Owner of any change in condition from Resident's original move-in date to the Lease Commencement Date ("Change in Condition") that was not the responsibility of Resident. Resident must submit any Change in Condition information to Owner within thirty (30) days of the Lease Commencement Date. Owner may inspect the Premises to validate the Change in Condition. If both parties agree, then the Change in Condition will be documented and Resident will not be responsible to remedy the Change of Condition at move-out."

e.   The first sentence the second paragraph of Section 10 is amended and expanded to read: "A pet deposit will not be required for pets on the Premises on or prior to the Lease Commencement Date. For pets acquired after that time, a refundable pet deposit will be required, which will be used by the Owner as necessary for any cleaning and/or damages caused by the pet(s) after Resident vacates the Premises."

f.   The following sentence is added to the end of Section 10: "On the Lease Signature Date, if Resident has more than two (2) pet mammals on the Premises, then Resident may keep all of those pets as long as Resident executes a Pet Addendum with Owner that lists each pet.

g.   Section 28a(iv) is amended to read: "clean and deliver the Premises to Owner in the same condition as it was delivered upon the original commencement of tenancy, less ordinary wear and tear, following the cleaning requirements for move-out in Exhibit A of the Community Handbook."

Resident: _____

Forest City Residential Management, Inc.
Agent for Owner

_____

By: _____

Date:   23 Sep 11

Date: _____

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_ , between
Forest City Southern Group, LLC, Owner, and _Ann Wilson_ ,
("Resident"), regarding property located at _295 Fluchid_ ,
(the "Premises").

Owner desires to maintain a quality living environment for Resident. To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:** Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures. When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:** In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors. Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth. Use environmentally safe household cleaners. A vacuum cleaner with a HEPA filter will help remove mold spores. Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts. Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner. Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom. Keep the shower curtain inside the tub or fully close the shower doors when showering. After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out. Run the fan on the furnace to help circulate fresh air. Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection. If condensations forms in the area, wipe it dry. Dry damp clothing as quickly as possible.

i.     Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

j.     Do not overfill closets or storage areas. Overcrowding restricts airflow.

k.     Promptly report to the Neighborhood Management Office:

      i.    Any leak, water damage, or signs of water infiltration;

      ii.   Any malfunction in the heating, ventilation, or air conditioning system;

      iii.   Windows or doors that do not open or close properly;

      iv.   Any areas of visible mold (except very small areas that respond to routine cleaning);

      v.    Musty or moldy odors;

      vi.   Health issues that Resident thinks may be linked to the air quality within the Premises;

      Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3. **EXISTING MOLD:** If small areas of mold have already formed on non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets — provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4. **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:** (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5. **COMPLIANCE:** If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

| Resident: _____ | Forest City Residential Management, Inc. Agent for Owner |
|---|---|
| | By: _____ |
| Date: _23 Sep 11_ | Date: _9/23/11_ |

Forest City Southern Group, LLC

Mold Addendum

# THIRD PARTY ALLOTMENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_
regarding property located at _295 Fairchild_ (the "Premises"), between
Forest City Southern Group, LLC ("Owner") and _Anal Wilson_
(who is the highest ranking military member that will reside in the Premises, referred to in this
Addendum as "Resident").

1.  **Payment by Allotment.** Resident agrees to pay Monthly Rent to Owner for the Premises as
    determined in the Lease Agreement, to be paid by allotment and/or electronic transfer (the
    "Allotment").

2.  **Managing Agent.** Owner shall contract with a third party managing agent for the processing
    of all of Resident's Allotment-related starts, stops and changes. The third party managing
    agent is Military Assistance Company/Fort Knox National Company ("MAC").

3.  **Resident Consent and Authorization.** Resident hereby authorizes Owner to act on behalf
    of Resident to start, stop and change Resident's Allotment for Monthly Rent under the Lease
    Agreement. Changes may be made for any valid reason under the Lease Agreement to
    include, but not be limited to, annual rate adjustments. Resident acknowledges that he/she
    shall not attempt to make any changes to the Allotment, and agrees that the Allotment may
    not be canceled prior to the satisfaction of the final Monthly Rent payment due under the
    Lease Agreement. Any actual or attempted cancellation of the Allotment by Resident is
    grounds for Owner to terminate the Lease Agreement.

4.  **Documentation.** Resident agrees to execute any and all documents which are necessary to
    authorize Owner and/or MAC to control the Allotment. Resident understands that he/she
    may not be permitted to occupy the Premises until the appropriate Allotment documentation
    has been completed.

Resident: _____

_____

Date: _23 Sep 11_

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _9/23/11_

Ed Williams

| | |
|---|---|
| From: | kat.quarles@moldtestusa.com |
| Sent: | Friday, March 17, 2017 12:02 PM |
| To: | Ed Williams |
| Subject: | MTUSA |
| Attachments: | Chain of Custody.pdf |

## Booking Info

| Booking Date | Booked by | Inspector Assigned |
|---|---|---|
| 3/17/2017 | Kat Quarles | Ed Williams - Pascagoula MS |

## Schedule Info

| Schedule Date | Schedule Time | Schedule Day |
|---|---|---|
| 3/22/2017 | 2:00 | Wednesday |

## Customer Information

| Customer Name | Customer Phone Number | Site Ownership |
|---|---|---|
| Rushing and Guice | (228) 374-2313 | owner |
| Customer address | | |
| 295 Fairchild Drive, Biloxi, MS 39531 | | |

## Inspection Info

| Type of Test | Base Price | Expedite | Electricity |
|---|---|---|---|
| Pre | $495.00 | No | Yes |

## Site Contact Info

| Name | Contact Number | Relation to Site |
|---|---|---|
| Ann Yarbrouth | (316) 207-4349 | Tenant |

## Additional Information

Wants 2 air samples and 1 additional tape lift.

## Mileage Bonus (if any)

$50.00

AFTER THE JOB, SAME DAY

• Send the samples and fully completed Chain of Custody to the lab





**Prepared for** _Rushing and Guice_

**Site Address** _295 Fairchild Drive_

**City** _Biloxi_   **State** _MS_   **Zip** _39531_

**Inspector** _Ed Williams_

**Date** _3/23/2017_   **Time** _2:00 PM_

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - **We always suggest to have a Direct ID Sample for visible microbial growth.**
   - **If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.**

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

**Important:** If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

**Client Present**   **Age of Home**   **Weather**   **Exterior Temp**

_Ann Yarbrough_   _12+ years_   _Sunny_   _85.2°_



# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☒ |
| 3 | Are gutters present? | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☒ | No ☐ |

Comments: (Note anything visible)

3. GUTTERS ON BACK OF HOUSE NEED TO BE CLEANED.

5. FRONT OF HOUSE SIDING SHOWS REMINANTS OF A climbing plant.

5. BUSHES ALONG front LEFT OF HOUSE ARE TO CLOSE TO HOUSE.

## ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

NONE

## Foundation Type

| 10 | Basement ☐ | Crawl ☐ | Slab ☒ |
|---|---|---|---|

## Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☐ | No ☒ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:

NONE



**52-Point Visual Inspection**

## Crawl Space (Enter only if safe to do so)

| | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☐ | No ☒ |
| 15 | Is there microbial growth? | Yes ☐ | No ☐ |
| 16 | Is there a vapor barrier? | Yes ☐ | No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☐ | No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☐ | No ☐ |
| 19 | Is there room for you to crawl? | Yes ☐ | No ☐ |
| 20 | Is there any rot? | Yes ☐ | No ☐ |
| 21 | Is the insulation intact? | Yes ☐ | No ☐ |
| 22 | Is the insulation wet? | Yes ☐ | No ☐ |
| 23 | Is the duct work intact? | Yes ☐ | No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☐ |
| 25 | Are the floor joists intact? | Yes ☐ | No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☐ |
| 27 | Are any vents blocked off? | Yes ☐ | No ☒ |

Comments:

N/A



52 Point Visual Inspection

# INSIDE

## Microbial Activity

| | | | Yes | No |
|---|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | | ☒ Yes | ☐ No |
| 31 | Is there a musty odor present? | | ☒ Yes | ☐ No |
| 32 | Are there any water marks? | | ☒ Yes | No |

Comments:
30- AC VENTS IN BR 2 & 3
30 - HVAC, CONDENSATE LINES, Ductwork IN GARAGE
30 - ITEMS IN STORAGE Rm
31- STORAGE Room

32- UPSTAIRS BATHROOM Door Jam
32- GARAGE - Hot WATER hEATER FoundatioN

## Attic

33    Anything suspicious? (including lack of proper ventilation)      Yes ☐   No ☒
**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.
Comments:
NoNE

## Kitchen and Laundry

| 34 | Is the dryer ventilation intact? | Yes ☒ | No ☐ |
|---|---|---|---|
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☒ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☒ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☒ |

Comments:
KitcheN HVAC REGISTER is Dirty / showing signs of
MicrobiAL growth.

© Mold Free USA 2015                                                     Page 1 of 8

VPI
USA

## Bedroom/Office(s)

**Indicate Name of Bedroom/offices

| | | R01 MSTR BR | R02 Bedroom 2 |
|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☒ No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒ No ☐ | Yes ☐ No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☒ | Yes ☒ No ☐ |

**Indicate Name of Bedroom/offices

| | | R03 STORAGE | R04 Bedroom 3 |
|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☐ | Yes ☐ No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☒ | Yes ☐ No ☒ |

**Indicate Name of Bedroom/offices

| | | R05 Living Room | R06 Dining Room |
|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒ No ☐ | Yes ☐ No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☒ No ☒ | Yes ☐ No ☒ |

**Indicate Name of Bedroom/offices

| | | R07 | R08 |
|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☐ | Yes ☐ No ☐ |

**Indicate Name of Bedroom/offices

| | | R09 | R10 |
|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☐ | Yes ☐ No ☐ |

**Indicate Name of Bedroom/offices

| | | R11 | R12 |
|---|---|---|---|
| 38 | Any microbial activity around windows? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☐ | Yes ☐ No ☐ |

*Handwritten diagonal note across R07–R12 section: "Not Further Examined"*

Comments:

38/41- Microbial growth & paint cracking on and around (R02) the HVAC register in Bedroom #2.

R03-40- No register/vent in room.

R04-40- Visible Microbial Growth on HVAC vent.

R03- Microbial Growth on multiple items located in Storage Rm

R06- Visible microbial growth on HVAC vent.

52 Point Vista Inspection

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

| | | Bathroom 1 | Bathroom 2 |
|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 43 | Any leaks under the sink? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 46 | Any leaks around hot water heater? | Yes ☒ No ☐ | Yes ☐ No ☒ |

Comments:
BATHROOM 3 (½ BATH)
42 - YES
43 - No
44 - N/A
45 - N/A

46. - HOTWATER HEATER IN GARAGE - WATER STAINS ON BASE.
INDICATIONS OF PREVIOUS LEAKS.

## HVAC

| | | | |
|---|---|---|---|
| 47 | Is there a return vent? | Yes ☒ | No ☐ |
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐ | No ☒ |

Comments: (Note condition of return and ducts)
RETURN VENT NEEDS CLEANSING
DUCTS IN GARAGE HAS microbialgrowth
CONDENSATE LINES & GARAGE AC UNIT HAVE AREAS OF MICROBIAL Growth.

## Relative Humidity Indoors

49. Readings /Comments:
64% RH @ 78.1°

## Moisture Indoors

50. Readings /Comments:
WALLS - < 5%
FLOOR - < 9%



**Do You Recommend Remediation?** Yes ☒   No ☐   Possibly ☐

**49. Explanation:**

Microbial growth in multiple areas associated with HVAC system including vents and ducts as well as items in storage area.

**Issues of Concern**

**50. Comments:**

Items in 49 above
Bushes touching side of house
Clogged gutters & missing downspout extensions
Algae growing next to foundation & microbial growth on brick.

**51. Recommended Preventative Measures:**

Clean gutters
Change HVAC filter monthly
Add downspout extensions
Trim bushes from side of house
Add HVAC duct in upstairs storage area
Have HVAC system serviced & cleaned

**Inspector Recommends These Areas to Test**

**52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.**

Surface growth on items in storage rm
Vents ~~ducts~~ in kitchen, dining, bedroom 2/3
Condensate lines in garage
Vent ductwork in garage

 

## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days.  *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after youreceive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   **If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with _____ at MTUSA.

**Please have Customer Initial the following:**

| | |
|---|---|
| I agree to pay $ _____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered. | Initial: |

## Signatures

**Inspector Signature:**

Date: 3/24/2017

**Customer Signature:**

Date:

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?     Yes     No

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

**Inspector Signature:**

Date: 3/24/2017

**Customer Signature:**

Date:



# Mold Test USA Customer Agreement

Property Address: _____   _____

The inspector recommends, and you agree, that the following areas be sampled:

| Location of sample | Type of Sample (circle) | # of samples in area | PRICING Base Rate: $ 495-∞ (includes 2 samples) Additional samples: $85 ea. |
|---|---|---|---|
| 1. OUTSIDE - FRONT YARD | (Air)/Swab/Tape/bulk material | 1 | |
| 2. 2ND FLOOR HALL | (Air)/Swab/Tape/bulk material | 1 | |
| 3. MUSIC CASE - STORAGE | Air/Swab/(Tape)/bulk material | 1 | 85.00 |
| 4. | Air/Swab/Tape/bulk material | | |
| 5. | Air/Swab/Tape/bulk material | | |
| 6. | Air/Swab/Tape/bulk material | | |
| 7. | Air/Swab/Tape/bulk material | | |
| 8. | Air/Swab/Tape/bulk material | | |
| 9. | Air/Swab/Tape/bulk material | | |
| 10. | Air/Swab/Tape/bulk material | | |

The inspector suggested the following areas below to be tested in which you chose not to have tested.

_____

Customer Initials _____

EXPEDITED?  YES (NO)(circle)   Waived Fee _____   Expedited Amount: $ _____

**Total Price for services rendered:**   $ 580-00

Payment Method: _____   **Transaction ID:** _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A GUARANTEE OF ANY KIND; NOR DOES IT SUBSTITUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results with you and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA. By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.   Customer Initials _____

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

_____   3/23/17      _____   3/23/2017
Customer's Signature      Date          Inspector's Signature      Date

Laboratory

# NML-20170327-Rushing and Guice - 295 Fairchild Dr

Spore Analysis Completed for



1101 1st Street South EXT. Suite B, Columbia, SC 29209
803-778-0562
admin@moldtestusa.com

| | |
|---|---|
| Collected Date | 3/22/2017 |
| Collected Street Address | 295 Fairchild Dr |
| Collected & Relinquished by | Ed Williams |
| # of Sample Sent | 3 |
| # of Sample Received & Accepted | 3 |
| Sample(S) Received & Accepted on | 03/27/2017 |
| Sample(S) Received & Accepted by | Crystal Hernandez |
| Sample(S) Analyzed on | 03/27/2017 |
| Sample(S) Analyzed by | Janna Komorowski |
| Report Approved by | Crystal Hernandez |
| **Report/Test Tpye** | **Standard** |

Thank you for using Newton Microbial Laboratory for your moisture needs. Should there be any future questions, we would encourage you to complete the Newton Analysis request inquiry with any comment. The interpretation of moisture is not a simple and straightforward the sample results will correspondingly be responsive to an individual methods of the structural needs. At the same time, it is important to understand any and all of the sample concerns. The results solely responsive to the sample interpretation. The results of the analysis pertain to only the analysis on the sample and should not objection construed on the evaluation of any final air flow in the sample by means of larger analysis. Newton Microbial Laboratory makes no express or implied warranties as to the results of the sample in accurate by Newton Microbial Laboratory makes no express or implied warranties to the right to analyze and discard the sample after the testing of this sample are provided. Newton Microbial Laboratory has reserves and no verbal for any alteration to the statistical deviation at any one of the use of these tests or results.

Spore Analysis Completed by

Janna Komorowski
Laboratory Director, B.A. in Biological Sciences

Crystal Hernandez
Operations Director, B.A. in Biology

Laboratory

1101 1st Street South EXT Suite C, Columbia SC 29209



Newton
Laboratory

| Property/Customer Name | | | Site Street Address | | | Site City | Site State | Site Zip |
|---|---|---|---|---|---|---|---|---|
| Rushing and Guice - 295 Fairchild Dr | | | 295 Fairchild Dr | | | Biloxi | MS | 39531 |
| Company Email | | | Company Phone Number | | | Date Collected | Date Received | |
| | | | 803-776-0562 | | | 3/22/2017 | 03/27/2017 | |
| Company Address | | | Company Name | | | Sample Collected by | Date Analyzed | |
| 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | | | Mold TEST USA | | | Ed Williams | 03/27/2017 | |

| Newton ML Sample ID | CAE20170327008S001AS | | | CAE20170327008S002AS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sample Name/Location | Sample #1 Outside | | | Sample #2 2nd Story-Hall | | | | | | | | |
| Volume (L) | 150 | | | 150 | | | | | | | | |
| Background | 3 | | | 3 | | | | | | | | |
| Analyt. Sensitivity 100X (Cts/M³) | 7 | | | 7 | | | | | | | | |
| Analyt. Sensitivity 400X* (Cts/M³) | 13* | | | 13* | | | | | | | | |
| Sample Type | Spore Trap | | | Spore Trap | | | | | | | | |
| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | | | | | | |
| Alternaria | 4 | 27 | 1.28% | 3 | 20 | 2.70% | | | | | | |
| Ascospores | 3 | 20 | 0.96% | 3 | 20 | 2.70% | | | | | | |
| Aspergillus\|Penicillium* | 104 | 1,331 | 64.10% | 50 | 640 | 86.49% | | | | | | |
| Basidiospores | 1 | 7 | 0.32% | Not Detected | | | | | | | | |
| Bipolaris\|Drechslera | 29 | 193 | 9.31% | 1 | 7 | 0.90% | | | | | | |
| Chaetomium | Not Detected | | | Not Detected | | | | | | | | |
| Cladosporium* | 27 | 346 | 16.64% | Not Detected | | | | | | | | |
| Curvularia | 6 | 40 | 1.93% | Not Detected | | | | | | | | |
| Epicoccum | 4 | 27 | 1.28% | 1 | 7 | 0.90% | | | | | | |
| Fusarium* | Not Detected | | | Not Detected | | | | | | | | |
| Memnoniella* | Not Detected | | | Not Detected | | | | | | | | |
| Myxomycetes\|Smuts | 11 | 73 | 3.53% | 6 | 40 | 5.41% | | | | | | |
| Pithomyces | 1 | 7 | 0.32% | Not Detected | | | | | | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | | | | | | |
| Stemphylium | Not Detected | | | Not Detected | | | | | | | | |
| Torula | Not Detected | | | Not Detected | | | | | | | | |
| Trichoderma* | Not Detected | | | Not Detected | | | | | | | | |
| Ulocladium | Not Detected | | | Not Detected | | | | | | | | |
| Unspecified Spore | 1 | 7 | 0.32% | 1 | 7 | 0.90% | | | | | | |
| Total | 191 | 2,077 | 100.00% | 65 | 740 | 100.00% | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hyphal Fragment* | | 71 | 473 | - | 11 | 73 | - | | | | | |
| Spore Trap + | Dander* | na | | - | na | | - | | | | | |
| | Fiber* | na | | - | na | | - | | | | | |
| | Pollen* | na | | - | na | | - | | | | | |
| Comments | | | | | | | | | | | | |
| | Color Code | | Common Outdoor | | Common Indoor | | Water Damange Indicator | | | Elevation/Variance | | |

Newton Fungal Assessment Report V201611.2
©2013-2017 Newton Microbial Laboratory

Newton
Laboratory



Sample #1 Outside    Sample #2 2nd Story-Hall    0    0

| | 0 | 200 | 400 | 600 | 800 | 1,000 | 1,200 | 1,400 |
|---|---|---|---|---|---|---|---|---|
| Alternaria | | | | | | | | |
| Ascospores | | | | | | | | |
| Aspergillus\|Penicillium* | | | | | | | | |
| Basidiospores | | | | | | | | |
| Bipolaris\|Drechslera | | | | | | | | |
| Chaetomium | | | | | | | | |
| Cladosporium* | | | | | | | | |
| Curvularia | | | | | | | | |
| Epicoccum | | | | | | | | |
| Fusarium* | | | | | | | | |
| Memnoniella* | | | | | | | | |
| Myxomycetes\|Smuts | | | | | | | | |
| Pithomyces | | | | | | | | |
| Stachybotrys | | | | | | | | |
| Stemphylium | | | | | | | | |
| Torula | | | | | | | | |
| Trichoderma* | | | | | | | | |
| Ulocladium | | | | | | | | |
| Unspecified Spore | | | | | | | | |

Newton
Laboratory

# Spore Trap Analysis Explanation

| | |
|---|---|
| **Volume** | Flow Rate * Flow Rate Minute |
| **Background** | None: Recollect |
| | 1: <5% |
| | 2: 5% ≤ Background Coverage < 25% |
| | 3: 25% ≤ Background Coverage < 70% |
| | 4: 70% ≤ Background Coverage < 90% |
| | 5: 90% ≤ Background Coverage < 100%, Recollect |
| **Cts/M³** | Spore Counts per Cubic Meter |
| **Hyphal Fragment** | Fragments of hyphae. Can be an additional indicator of possible mold presences |
| **Unspecified Spore** | Less commonly identified spore types, other than those listed on the report |
| **Limit of Detection** | 1 spore count per coverage examined area |
| **Sample Type** | |
| Spore Count | Spore Trap Cassettes   Identification & Enumeration of Fungal Spores |
| Spore Count+ | Spore Trap Cassettes   Identification & Enumeration of Fungal Spores |
| | + Total Dander, Fiber, and Pollen Count |
| **Spore Trap Analytical Report Method** | |
| | NML-SAM-1611, adapted from ASTM D7391-9 |

* Uncertainty available upon request

Newton
Laboratory

| Site Name | | Site Address  Site Address | Site City | Site State | Site Zip |
|---|---|---|---|---|---|
| Rushing and Guice - 295 Fairchild Dr | | 295 Fairchild Dr | Biloxi | MS | 39531 |

| Company Email | Company Phone Number | Date Collected | Date Received |
|---|---|---|---|
| admin@moldtestusa.com | 803-776-0562 | 3/22/2017 | 03/27/2017 |

| Company Address | Company Na Company Name | Sample Collected by | Date Reported |
|---|---|---|---|
| 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | Mold TEST USA | Ed Williams | 03/27/2017 |

| Newton ML Sample ID | CAE20170327008S001TS | | | |
|---|---|---|---|---|
| Sample Name / Location | Storage Rm - Case | | | |
| Sample Type | Direct ID - Tape | | | |

| Organism | Category | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | | | |
|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | | | | |
| Ascospores | ND | | | | | | | |
| Aspergillus\|Penicillium | High | | | | | | | |
| Basidiospores | ND | | | | | | | |
| Bipolaris\|Drechslera | ND | | | | | | | |
| Chaetomium | ND | | | | | | | |
| Cladosporium | ND | | | | | | | |
| Curvularia | ND | | | | | | | |
| Epicoccum | ND | | | | | | | |
| Fusarium | ND | | | | | | | |
| Memnoniella | ND | | | | | | | |
| Myxomycetes\|Smuts | ND | | | | | | | |
| Pithomyces | ND | | | | | | | |
| Stachybotrys | ND | | | | | | | |
| Stemphylium | ND | | | | | | | |
| Torula | ND | | | | | | | |
| Trichoderma | ND | | | | | | | |
| Ulocladium | ND | | | | | | | |
| Unspecified Spore | ND | | | | | | | |

ND = Not Detected

| Hyphal Fragment | Moderate | | | |
|---|---|---|---|---|
| Background Debris | Light | | | |
| Comments | | | | |

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Color Code |
|---|---|---|---|---|

Newton Report ID
20170327 Rushing and Guice - 295 Fairchild Dr.xlsm

Newton
Laboratory

# Direct Identification Explanation

**Direct ID**

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

**Unspecified Spore**   Less commonly identified spore types, other than those listed on the report

**Sample Type**

| | | |
|---|---|---|
| Direct ID-Swab | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Swab+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Tape | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Tape+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Bulk | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Bulk+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |

**Direct Analytical Report Method**

NML-SAM-1611



Newton
Laboratory

  

## Growth & Distribution

- Alternaria is one of the most common and widely distributed molds on the planet (2). The reproductive spores become airborne easily and are prolific in the atmosphere worldwide.
- **Growth Rate:** Rapid Mature with 0.5 to 8 days (34)
- **Water activity:** 0.85-0.88 (1)
- **Outdoors:** In the outdoor environment, Alternaria is found in soil, water and plant material- it plays an important role in vegetable matter decomposition (1) . Airborne Alternaria spore counts are often higher around farming and agricultural operations, particularly during harvesting processes when spores are released into the air in large numbers. (3) It is well studied as a plant pathogen having saprophytic effects on a wide variety of vegetation and is often the source of early blights in crops (2). It reaches peak concentrations during late summer and fall (2).
- **Indoors:** Alternaria can be found growing indoors on textiles, dust, wood, carpeting, flooring, drywall or gypsum board, wall paper, furniture, and other cellulose materials. It can be found in humidifiers, heating and air conditioning units, inside of ductwork, and surrounding damp areas i.e. sinks, showers, and windows(1).

## Health Effects

- **Allergenic**
  - Considered by some to be among the most common mold allergens in the US (1).
  - Alternaria can cause allergy symptoms following ingestion, inhalation, injection or direct contact.
  - Alternaria spores are airborne allergens (1). Reactions due to inhalation may increase during peak concentration times in late summer and early fall.
  - Inhalation of high concentrations by sensitive individuals may manifest in Type I and Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III).

- **Pathogen**
  - Invasion is rare but can occur, particularly in immunocompromised individuals. Cases of onychomycosis (nail infection), sinusitis, ulcerated cutaneous infections, keratitis, phaeohyphomycosis, as well as osteomyelitis and peritonitis in patients undergoing peritoneal dialysis have been reported (1,4).
  - Can occasionally cause phaeohyphomycosis (fungal infection), usually in subcutaneous tissue (6).

- **Toxins/ Metabolites**
  - Alternariol (antifungal uses), AME (alternariol monomethylether), tenuazonic acid, & altertoxins (1)

Found in Sample(s)
AIR        •Sample #1 Outside•Sample #2 2nd Story-Hall•••••••••••••
DIRECT        ••••••••••••••••••

(1) list of references can be found at http://newtonlaboratory.com/glossary

Newton
Laboratory





## Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

- Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
- **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.
- **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

## Health Effects

- **Allergen**
  - Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  - Reactions due to spore inhalation may increase following rain or high humidity. (5)
  - Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

- **Pathogen**
  - Some types can be pathogenic; dependent upon genus and species.

- **Toxins\Metabolites**
  - Vary greatly depending on genus and species.

Found in Sample(s)
AIR          •Sample #1 Outside•Sample #2 2nd Story-Hall••••••••••••
DIRECT       ••••••••••••••••••

() List of references can be found at  http://newtonlaboratory.com/glossary

Newton
Laboratory

# Aspergillus/Penicillium



**Growth & Distribution (7):**

- Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."

- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower(6).
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates- particularly plant materials such as cereals, grains, decaying wood, and soil (7).
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods (7). Penicillium is used in cheese production and is responsible for the veins in blue cheese.

**Health Effects**

- **Allergen:**
  - Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.
  - Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.
  - Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen (6,7):**
  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes. (6). In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) *P. marnefei* can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**
  - Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

Found in Sample(s)

AIR      •Sample #1 Outside•Sample #2 2nd Story-Hall•••••••••••••

DIRECT   •Storage Rm - Case•••••••••••••••••

(1 list of references can be found at http://newtonlaboratory.com/glossary

# Newton
## Laboratory

# Basidiospores

**Growth & Distribution:**

- Basidiospores are spores produced by the division of Fungi known as Basidiomycota. These spores are unique for lacking septation, containing bilateral symmetry, and often having a visible pore at the site of detachment from the basidium (7). This is a large group of organisms consisting of a large number of individual genera & species. Distribution is world-wide with the prevalence in any given area varying for each genus and species. Like ascospores, basidiospores disperse using water droplets. Therefore, airborne spore concentrations are often higher following rain or high humidity. This division includes edible mushrooms.

- **Outdoors:** Basidiospores are found growing on plant material, organic debris, and soil. Many species of basidiospores are known to be plant pathogens.

- **Indoors:** Basidiospores may be found growing on damp materials. Colonies may grow given sufficient access to water (leaks, flooding, high humidity, or surrounding plumbing, heating/air conditioning components, appliances, house plants, etc.).

**Health Effects:**

- **Allergenic:**
  - Exposure to these spores is commonplace in both indoor and outdoor environments. Nonetheless they are also potentially allergenic. Allergic responses may occur following inhalation, ingestion, or direct contact. Reactions due to inhalation may be increased following rain or high humidity when spore concentrations are often elevated.
  - In sensitive individuals, typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogenic:**
  - Invasion is not typical but can occur, particularly in the immunocompromised or immunosuppressed. These infections can includes sinitus, keratitis, phaeohyphomycosis, & peritonitist.

- **Toxins\Metabolites:**
  - Mycotoxins vary depending on genus and species. They are especially relevant in edible fungi of this division such as mushrooms.
    - Common sources of mushroom poisoning include *Amnita, Lepiota, Coprinus, & Psilocybe*

*Sample #1 Outside•••••••••••••••
••••••••••••••••

Taved in Sample(s)
AIR
DIRECT

( A List of references can be found at http://newtonlaboratory.com/glossary

Newton
Laboratory

# Bipolaris/Drechslera/Exserohilum



**Growth & Distribution:**

‒ Bipolaris, Drechslera, Exserohilum, & Helminthosporium are dematiaceous fungi, producing spores which are elongate, cylindrical, often with numerous septations or cells. These genera are grouped together due to spore similarity. These spores are common in both indoor and outdoor environments. They are found world wide with some species being exceptionally tolerant of dry environments (6).

‒ **Growth Rate:** Rapid – Mature within 5 days (6)

‒ **Water Activity:** 0.80 (this is a generalized number for common molds) (26)

‒ **Outdoors:** These molds are most commonly found on grasses, grains and other plant materials. Bipolaris can be a plant pathogen causing spots, blights, rots, and other symptoms in staple crops like rice, wheat, and sorghum. In the past, plant disease caused by Bipolaris invasion has caused starvation of large human populations. In 1943-1944 the Bengal famine in India was caused by *Bipolaris oryzae* disease in rice. In the 1970s, *Bipolaris maydis* was responsible for a devastating leaf blight resulting in huge losses of corn crops in the USA & UK. (11)

‒ **Indoors:** This mold may be found on water damaged materials, food stuffs, houseplants, and other organic materials.

**Health Effects:**

‒ **Allergenic:**

- These molds are highly common in both indoor and outdoor environments; most people have some level of exposure on a daily basis.
- In sensitive individuals can manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

‒ **Pathogenic:**

- Bipolaris (rapid growth – mature within 5 days) can be pathogenic in rare instances, particularly in immunocompromised. May invade bone, cornea (keratomycosis), skin, aorta, lung, central nervous system or cause brain lesions (6).
- Exserohilum (rapid growth – mature within 5 days) can cause phaeohyphomycosis (infection of mycelia/hyphae of dematiaceous fungi), most commonly in nasal sinuses, skin, subcutaneous tissue, and cornea. Rare reports of fatal disseminated infection (6).

‒ **Mycotoxins/Metabolites:**

- Cytochalasin, sporidesmin, sterigmatocystin (7)

Found in Sample(s)
AIR            •Sample #1 Outside•Sample #2 2nd Story•Hall••••••••••••••
DIRECT       ••••••••••••••••••

[ list of references can be found at  http://newtonlaboratory.com/glossary

Newton
Laboratory

Newton Report ID
20170327 Rushing and Guice - 295 Fairchild Dr.xlsm

# Cladosporium

  

**Growth & Distribution:**

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).
- **Growth Rate:** Moderately Rapid – Mature within 7 days. (6)
- **Water Activity:** 0.85-0.88 (1)
- **Outdoors:** Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (*C. cladosporiodides*) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).
- **Indoors:** Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

**Health Effects:**

- **Allergen:**
  - Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
- **Pathogen:**
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).
- **Mycotoxins/Metabolites:**
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

Found in Sample(s)
AIR          •Sample #1 Outside•••••••••••••
DIRECT       ••••••••••••••••

( ) List of references can be found at: http://newtonlaboratory.com/glossary

   

## Growth & Distribution

- Curvularia is found world-wide with a particular preference for the tropics and warmer climates (7). Spores usually have a unique curved shape caused by an enlarged central cell (2). Airborne spores are common in both Indoor and outdoor environments worldwide.
- **Growth Rate:** Moderately rapid - 4 to 12 days (32)
- **Water activity:** 0.80 (this is a generalized number for common molds) (26)
- **Outdoors:** Curvularia is typically seen growing on plant material. They are weakly pathogenic to plants and are the cause of leaf spots, seedling blight, and failing of seedling germination (2).
- **Indoors:** Curvularia may be found growing on materials containing cellulose such as woods and grains. Growth is less frequent indoors but may be seen on food.(7)

## Health Effects:

- **Allergen:**
  - Poorly studied but believed to be an allergen and irritant (13).
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis &allergic sinusitis (Type III). (5)
- **Pathogen:**
  - Believed to cause corneal infections in the immunocompromised (14)
  - Opportunistic infections of cornea and sinuses, nails, subcutaneous tissue, and systemic organs. Dissemination to the brain can occur rarely. (6)
  - Can be causal agent in mycetoma (6):
    - Infections of subcutaneous tissue and skin. Untreated, chronic infections may progress to involve muscle, fascia & bone. Typically seen on the lower leg or foot, rarely disseminated.
    - Fungi enters the skin via wound, a nodule slowly develops into a tumor or abnormal tissue mass beneath the skin, cavities are formed within the mass and discharge occurs.
    - This is a rare condition which is not contagious. (6) Most infections occur in immunocompromised hosts. (2)
- **Toxins/Metabolites:**
  - Some toxins produced- mainly studied in plants.

Found In Sample(s)
AIR        •Sample #1 Outside••••••••••••••
DIRECT    ••••••••••••••••••

( ) Um of references can be found at  http://newtonlaboratory.com/glossary

Newton
Laboratory

 

## Epicoccum

### Growth & Distribution

- Epicoccum is found worldwide. Spores are large with distinctive, highly septate morphology and dark brown color (7). Spores are dispersed easily by the wind. Airborne concentrations are generally higher on dry, windy days with higher counts occurring later in the day (1). Spores are common in both outdoor and indoor air.
- **Growth Rate:** Moderately Rapid – Mature within 7 days (6)
- **Water Activity:** 0.86-0.90 (1)
- **Outdoors:** Epicoccum is most often found on aging or decaying plants. It is known to invade various parts of dead plants such as the seeds of corn, barley, oats, & wheat as wells as beans and surrounding soil. Can also invade insects. (7)
- **Indoors:** Found on cellulose materials (e.g. gypsum boards, floors, paper, woods, cardboard) and other organic materials (e.g. house plants, dust, and occasionally human skin and sputum(7)).

### Health Effects:

- **Allergen:**
  - Believed to be an important spore in inducing fungi-related respiratory allergy disorders. Increases in outdoor spore concentrations may exacerbate asthma attacks in children.(1)
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Not believed to be infectious in humans (1).
    - 1 reported case of fatal haematogenous mycosis in a severely immunosuppressed allogenenic hematopoietic stem cell transplant recipient possibly attributed to Epicoccum (1).

- **Toxins/Metabolites:**
  - No toxins or metabolite reported to be harmful to humans.
  - Produces secondary metabolites and mycotoxins which may be useful as biocontrol agents against bacteria, fungi, & viruses (1).
    - E.g. *E nigrum* against *Monilinia* spp. on fruit (7).

Found in Sample(s)
AIR     •Sample #1 Outside•Sample #2 2nd Story-Hall•••••••••••
DIRECT  ••••••••••••••••

( ) List of references can be found at  http://newtonlaboratory.com/glossary

Newton
Laboratory

Newton Report ID
20170327 Rushing and Guice - 295 Fairchild Dr.xlsm

 

### Growth & Distribution

&mdash; Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size $(4 - 20\ \mu m)$(25).

* **Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).
* **Water Activity:** 0.80 (this is a generalized number for common molds)(26).
* **Outdoors**
  &mdash; Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)
* **Indoors**
  &mdash; Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

### Health Effects:

&mdash; **Allergen:**
  * These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.
  * In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

&mdash; **Pathogen:**
  * Unknown

&mdash; **Toxins/Metabolites:**
  * Unknown

Founded in Sample(s)

AIR    •Sample #1 Outside•Sample #2 2nd Story-Hall•••••••••••••

Direct    •••••••••••••••••

( ) List of references can be found at http://newtonlaboratory.com/glossary

Newton
Laboratory

Newton Report ID
20170327 Rushing and Guice - 295 Fairchild Dr.xlsm

   

## Growth & Distribution:

The colonies grow fairly fast, usually dark (grey to black) in color, while occasionally being yellowish white in color, suede- like to downy, with multicellular conidia (phragmo- or dictyoconidia) forming on peg- like extensions. The conidia extensions are oblong, segmented, verrucose and light brown in color. (4, 29) These spores can be distributed by light winds, rain, and by grazing sheep (27).

- **Growth Rate:** Rapid – Mature within 5 days (6)
- **Water Activity:** 0.80 – 0.89 (28)
- **Outdoors**
  - Can be found on soil and litter (4). During sheep grazing can be found on herbage due to dry litter. (27)
- **Indoors**
  - Can be found on paper (30).

## Health Effects:

- **Allergen:**
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Can very rarely cause infection in the immunocompromised (6).
  - Can cause onychomycosis (29).
  - One case of peritonitis reported in a patient with vulvar cancer. (29)

- **Toxins/Metabolites:**
  - Sporidesmin (a mycotoxin which causes facial eczema in sheep)(31).

Found in Sample(s)

AIR      •Sample #1 Outside•••••••••••••

DIRECT   ••••••••••••••••

[ ] List of references can be found at  http://newtonlaboratory.com/glossary

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

MICHAEL YARBROUGH, JR., ANN YARBROUGH AND
ALIZELYIA YARBROUGH, MICHAEL YARBROUGH, III
AND JAMES YARBROUGH, MINORS,
BY AND THROUGH THEIR NATURAL GUARDIANS,
MICHAEL YARBROUGH, JR. AND ANN YARBROUGH                    **PLAINTIFFS**

**VERSUS**                                        CAUSE NO. A2402-2017-159

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z            **DEFENDANTS**

<u>SUMMONS</u>

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:   **Hunt MH Property Management, LLC**
      **c/o Registered Agent**
      **Capitol Corporate Services, Inc.**
      **248 E. Capitol Street, Suite 840**
      **Jackson, Mississippi 39201**
      **OR WHEREEVER THEY MAY BE FOUND**

<u>NOTICE TO DEFENDANT(S)</u>

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi, Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean Springs, Mississippi 39564.** Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of December 2017.

Connie Ladner _____ Clerk

BY: _____ D.C.

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
## SECOND JUDICIAL DISTRICT

MICHAEL YARBROUGH, JR., ANN YARBROUGH AND
ALIZELYIA YARBROUGH, MICHAEL YARBROUGH, III
AND JAMES YARBROUGH, MINORS,
BY AND THROUGH THEIR NATURAL GUARDIANS,
MICHAEL YARBROUGH, JR. AND ANN YARBROUGH                    **PLAINTIFFS**

VERSUS                                        CAUSE NO. A2402-2017-159

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z         **DEFENDANTS**

## COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, Michael Yarbrough, Jr., Ann Yarbrough and Alizelyia
Yarbrough, Michael Yarbrough, III and James Yarbrough, Minors, by and through their natural
guardians, Michael and Ann Yarbrough (Plaintiffs), by and through their attorneys, Rushing &
Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest City
Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property
Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate
Entities N through Z (Defendants), and for good cause of action, states unto the Court the
following, to-wit:

F I L E D

DEC 2 2 2017

CONNIE LADNER
CIRCUIT CLERK

BY_____D.C.

## PARTIES

1.

Plaintiff, Michael Yarbrough, Jr., ("Michael"), is an adult citizen of Harrison County, Mississippi residing at 295 Fairchild Drive, Biloxi, Mississippi.

2.

Plaintiff, Ann Yarbrough ("Ann"), is an adult citizen of Harrison County, Mississippi residing at 295 Fairchild Drive, Biloxi, Mississippi.

3.

Plaintiff, Alizelyia Yarbrough ("Alizelyia"), is the minor child of Michael and Ann, her natural guardians, born July 11, 2007, and is a resident of the State of Mississippi, residing at 295 Fairchild Drive, Biloxi, Mississippi.

4.

Plaintiff, Michael Yarbrough, III ("Michael III"), is the minor child of Michael and Ann, his natural guardians, born July 22, 2013, and is a resident of the State of Mississippi, residing at 295 Fairchild Drive, Biloxi, Mississippi.

5.

Plaintiff, James Yarbrough ("James"), is the minor child of Michael and Ann, his natural guardians, born September 11, 2016, and is a resident of the State of Mississippi, residing at 295 Fairchild Drive, Biloxi, Mississippi.

6.

Defendant, Hunt Southern Group, LLC (Hunt Southern), fka Forest City Southern Group, LLC (Forest City Southern), is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of

Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

7.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360, Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City Southern Group on the lease for the property in issue.

8.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a Delaware Limited Liability Company, registered to do business in Mississippi and may be served through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is the agent of Hunt Southern and has been charged with the maintenance and upkeep of the property in issue.

9.

Other Unknown John and Jane Does A through M are unknown Defendants who may be seasonably supplemented after discovery.

10.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be seasonably supplemented after discovery.

## JURISDICTION AND VENUE

11.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in Harrison County as this is the location where the injuries were sustained, where the cause of action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

12.

Ann is a Technical Sergeant with the United States Air Force. In September of 2011, after Ann was stationed at Keesler Air Force Base, Plaintiffs moved to Biloxi, Mississippi. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendants.

13.

Plaintiffs signed a Military Lease Agreement with Defendants on September 23, 2011. Plaintiffs were assigned military housing at 295 Fairchild Drive in Biloxi, Mississippi in the County of Harrison (Subject Property). See Military Lease Agreement Attached hereto as

Exhibit "A." Plaintiffs moved into the Subject Property in September of 2011. The Subject Property is located in the West Falcon Park Neighborhood, which is military housing specifically for Junior Enlisted (E1-E6). West Falcon Park is comprised of approximately 140 homes and is located near Keesler Air Force Base. At all times mentioned herein, the Subject Property was owned, controlled or managed by Defendants.

14.

At the time Plaintiffs entered into the Military Lease Agreement, West Falcon Park was owned and operated by Defendants. Defendants exercised custody and control over West Falcon Park and acted as the owners of West Falcon Park through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

15.

While residing in the Subject Property, Plaintiffs reported several maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was later learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the subject property. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses it operates.

16.

Plaintiffs repeatedly requested that Defendants address the mold and leaking problems while they lived in the Subject Property. Rather than removing the mold, Defendants simply cleaned it with soap and water. Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided at West Falcon Park, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

17.

On March 22, 2017, testing was performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with less being found outside the Subject Property. These elevated levels of toxic mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

18.

Plaintiffs have obtained information from other military housing families which leads them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in West Falcon Park.

19.

As a direct result of the continued exposure to toxic mold located in the Subject Property, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical

injuries, medical expenses and property damage. They also suffered property loss due to mold contamination and have not been compensated for any of their losses.

20.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

21.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

22.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and

mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

COUNT I

NEGLIGENCE

23.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 22.

24.

Defendants, as owners and/or managers of West Falcon Park:

A.      Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.      Negligently failed to pay for relocation expenses and caused Plaintiffs to pay for the moving expenses;

C.      Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.      Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.      Negligently managed and maintained West Falcon Park;

F.      Negligently supervised their employees, agents and/or representatives;

G.      Negligently trained and supervised their employees, agents and/or representatives;

H.      Negligently inspected West Falcon for dangerous and harmful conditions;

I.      Negligently remediated the toxic mold contained in the Subject Property;

J.     Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.     Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.     Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.     Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

25.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

COUNT II

GROSS NEGLIGENCE

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

28.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on September 23, 2011. The contract was breached for the following reasons:

A.   Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.   Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.   The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.     Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.     Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.     Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.     Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation." Plaintiffs shouldered the entire cost of the relocation.

31.

As a direct and proximate result of Defendants breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

### 32.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 31.

### 33.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 34.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 33.

### 35.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

36.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 35.

37.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.     Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.     Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.     Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.     Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.     Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

### 38.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 37.

### 39.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

### 40.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 39.

### 41.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

### 42.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 41.

### 43.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which was repeated until Plaintiffs moved out of the Subject Property.

## DISABILITY OF INFANCY

### 44.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 43.

### 45.

Alizelyia, Michael III, and James are minors, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

### 46.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 45.

### 47.

As a direct and proximate result of Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, Michael Yarbrough, Jr. sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being.

reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Ann Yarbrough, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Alizelyia Yarbrough, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for:

D. Plaintiff, Michael Yarbrough III, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for; and

E. Plaintiff, James Yarbrough, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

48.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 47.

49.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

50.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 49.

51.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

MICHAEL YARBROUGH, JR., ANN
YARBROUGH AND ALIZELYIA
YARBROUGH, MICHAEL YARBROUGH, III
AND JAMES YARBROUGH, MINORS,
BY AND THROUGH THEIR NATURAL
GUARDIANS, MICHAEL YARBROUGH, JR.,
AND ANN YARBROUGH, PLAINTIFFS

BY:

WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS 39533
TELEPHONE: (228) 374-2313
FAX: (228) 875-5987
ATTORNEYS FOR PLAINTIFFS

Installation: Keesler Air Force Base
Forest City Southern Group, LLC
Neighborhood Management Office
303 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

## MILITARY LEASE AGREEMENT

| | |
|---|---|
| 1. Lease Agreement Date:  September 23, 2011 | 6. Premises Address: 0295 FAIR |
| 2. Resident(s)  10016368      Pay Grade: | 295 Fairchild Dr |
|   Ann M Wilson      E05 | Biloxi, MS 39531 |
| | 7. Monthly Rent:  $1,164.00 |
| | 8. Partial Month Rent: |
| 3. Other Occupants: | 9. Partial Month Rent Due Date: |
| | 10. Security Deposit: |
|   Alizelyia Wilson | 11. Late Charge: $50.00 as specified in Paragraph 5 |
| | 11. Late Charge: $50.00 as specified in Paragraph 5 |
| | 12. Returned Check: $35 as specified in Paragraph 5 |
| 4. Lease Term: | |
|   a. Commencement Date:  October 1, 2011 | |
|   b. Expiration Date:  September 30, 2012 | |
| 5. Neighborhood:  West Falcon Park | |

Resident agrees to pay Rent to Owner by monthly electronic Allotment. Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement. Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated

This Lease Agreement is a legally binding contract. Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement. The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident. Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC.

By Authorized Representative: _____     9/23/11
                                                                   Date

Resident: _____  23 Sep 11          Resident: _____
                              Date                                    Date

Addenda:
☐   Community Handbook         ☐   Other: _____
      Dated 09/11              ☐   Other: _____
☐   Mold Addendum             ☐   Other: _____
☐   Third Party Allotment Addendum   ☐   Other: _____
☐   Pet Addendum              ☐   Other: _____
☐   Current Resident Addendum



EQUAL HOUSING
OPPORTUNITY

EXHIBIT

# CURRENT RESIDENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_ (the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and _____ ("Resident") regarding property located at _Ann Wilson_ _295 Fairchild_ (the "Premises").

1. **Acknowledgment of Residence.** Owner and Resident acknowledge that Resident occupied the Premises on and prior to the Lease Signature Date; and Resident shall continue to reside in the Premises under the Lease Agreement.

2. **Amendments to Lease Agreement.** Owner and Resident agree to the following amendments to the Lease Agreement:

   a. The first paragraph of Section 3 is amended to read: "This Lease Agreement shall be for the term beginning on the Lease Commencement Date specified on Page 1 Number 4a and terminating on the Lease Expiration Date specified on Page 1 Number 4b (the "Term"). If the Term is for twelve (12) months, Owner reserves the right to extend the Lease Commencement Date to a date no later than December 1, 2011, and to delay the Lease Expiration Date to twelve (12) months after the delayed Lease Commencement Date. For Owner to delay the dates of the Term, Owner must notify Resident of the delayed Lease Commencement Date and delayed Lease Expiration Date prior to the Lease Commencement Date on Page 1 Number 4a. Owner's notification to Resident shall be by certified mail, return receipt requested. In such event, the Lease Agreement shall commence on the delayed Lease Commencement Date and terminate on the delayed Lease Expiration Date."

   b. The following sentence is added to the end of the first sentence in the first paragraph in Section 4: "As of the Lease Commencement Date, if Resident is occupying a Premises that is in a Housing Category above the Resident's military rank, the Monthly Rent shall be based on the BAH with dependents rate of the military grade of the Resident (or senior service member in multiple member households)."

   c. The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

   d. Section 6 is amended to read: "Resident acknowledges that he/she is in possession of the Premises on the Lease Commencement Date and accept the Premises "as is" as of the date Resident originally commenced occupancy of the Premises, which condition is described in Resident's original move-in condition form, a copy of which is on file with Owner and will be provided to Resident upon request. However, Resident reserves the right to inform Owner of any change in condition from Resident's original move-in date to the Lease Commencement Date ("Change in Condition") that was not the responsibility of Resident. Resident must submit any Change in Condition information to Owner within thirty (30) days of the Lease Commencement Date. Owner may inspect the Premises to validate the Change in Condition. If both parties agree, then the Change in Condition will be documented and Resident will not be responsible to remedy the Change of Condition at move-out."

e.  The first sentence the second paragraph of Section 10 is amended and expanded to read: "A pet deposit will not be required for pets on the Premises on or prior to the Lease Commencement Date. For pets acquired after that time, a refundable pet deposit will be required, which will be used by the Owner as necessary for any cleaning and/or damages caused by the pet(s) after Resident vacates the Premises."

f.  The following sentence is added to the end of Section 10: "On the Lease Signature Date, if Resident has more than two (2) pet mammals on the Premises, then Resident may keep all of those pets as long as Resident executes a Pet Addendum with Owner that lists each pet.

g.  Section 28a(iv) is amended to read: "clean and deliver the Premises to Owner in the same condition as it was delivered upon the original commencement of tenancy, less ordinary wear and tear, following the cleaning requirements for move-out in Exhibit A of the Community Handbook."

Resident:

_____

_____

Date:   23 Sep 11

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _____9/23/11_____

Installation: Keesler Air Force Base
Forest City Southern Group, LLC
Neighborhood Management Office
303 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

## MILITARY LEASE AGREEMENT

| | | | | | |
|---|---|---|---|---|---|
| 1. Lease Agreement Date: | September 23, 2011 | | 6. Premises Address: | | 0295FAIR |
| 2. Resident(s) | t0046368 | Pay Grade: | 295 Fairchild Dr | | |
| | | | Biloxi, MS 39531 | | |
| Ann M Wilson | | E05 | 7. Monthly Rent: | | $1,164.00 |
| | | | 8. Partial Month Rent: | | |
| 3. Other Occupants: | | | 9. Partial Month Rent Due Date: | | |
| | | | 10. Security Deposit: | | |
| Alizelyia Wilson | | | 11. Late Charge: $50.00 as specified in Paragraph 5 | | |
| | | | 11. Late Charge: $50.00 as specified in Paragraph 5 | | |
| | | | 12. Returned Check: $35 as specified in Paragraph 5 | | |

4. Lease Term:
   a. Commencement Date:      October 1, 2011
   b. Expiration Date:          September 30, 2012
5. Neighborhood:    West Falcon Park

Resident agrees to pay Rent to Owner by monthly electronic Allotment. Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement. Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated.

This Lease Agreement is a legally binding contract. Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement. The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident. Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC.

By Authorized Representative: _____          9/23/11
                                                              Date

Resident: _____  23 Sep 11      Resident: _____
                             Date                                Date

Addenda:
   ☐   Community Handbook          ☐   Other:
        Dated 09/11                ☐   Other:
   ☐   Mold Addendum               ☐   Other:
   ☐   Third Party Allotment Addendum   ☐   Other:
   ☐   Pet Addendum                ☐   Other:
   ☐   Current Resident Addendum

EQUAL HOUSING OPPORTUNITY

## CURRENT RESIDENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_ (the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and _Ann Wilson_ ("Resident") regarding property located at _295 Fairchild_ (the "Premises").

1.  **Acknowledgment of Residence.** Owner and Resident acknowledge that Resident occupied the Premises on and prior to the Lease Signature Date, and Resident shall continue to reside in the Premises under the Lease Agreement.

2.  **Amendments to Lease Agreement.** Owner and Resident agree to the following amendments to the Lease Agreement:

    a.  The first paragraph of Section 3 is amended to read: "This Lease Agreement shall be for the term beginning on the Lease Commencement Date specified on Page 1 Number 4a and terminating on the Lease Expiration Date specified on Page 1 Number 4b (the "Term"). If the Term is for twelve (12) months, Owner reserves the right to extend the Lease Commencement Date to a date no later than December 1, 2011, and to delay the Lease Expiration Date to twelve (12) months after the delayed Lease Commencement Date. For Owner to delay the dates of the Term, Owner must notify Resident of the delayed Lease Commencement Date and delayed Lease Expiration Date prior to the Lease Commencement Date on Page 1 Number 4a. Owner's notification to Resident shall be by certified mail, return receipt requested. In such event, the Lease Agreement shall commence on the delayed Lease Commencement Date and terminate on the delayed Lease Expiration Date."

    b.  The following sentence is added to the end of the first sentence in the first paragraph in Section 4: "As of the Lease Commencement Date, if Resident is occupying a Premises that is in a Housing Category above the Resident's military rank, the Monthly Rent shall be based on the BAH with dependents rate of the military grade of the Resident (or senior service member in multiple member households)."

    c.  The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

    d.  Section 6 is amended to read: "Resident acknowledges that he/she is in possession of the Premises on the Lease Commencement Date and accept the Premises "as is" as of the date Resident originally commenced occupancy of the Premises, which condition is described in Resident's original move-in condition form, a copy of which is on file with Owner and will be provided to Resident upon request. However, Resident reserves the right to inform Owner of any change in condition from Resident's original move-in date to the Lease Commencement Date ("Change in Condition") that was not the responsibility of Resident. Resident must submit any Change in Condition information to Owner within thirty (30) days of the Lease Commencement Date. Owner may inspect the Premises to validate the Change in Condition. If both parties agree, then the Change in Condition will be documented and Resident will not be responsible to remedy the Change of Condition at move-out."

e.   The first sentence the second paragraph of Section 10 is amended and expanded to read: "A pet deposit will not be required for pets on the Premises on or prior to the Lease Commencement Date. For pets acquired after that time, a refundable pet deposit will be required, which will be used by the Owner as necessary for any cleaning and/or damages caused by the pet(s) after Resident vacates the Premises."

f.   The following sentence is added to the end of Section 10: "On the Lease Signature Date, if Resident has more than two (2) pet mammals on the Premises, then Resident may keep all of those pets as long as Resident executes a Pet Addendum with Owner that lists each pet.

g.   Section 28a(iv) is amended to read: "clean and deliver the Premises to Owner in the same condition as it was delivered upon the original commencement of tenancy, less ordinary wear and tear, following the cleaning requirements for move-out in Exhibit A of the Community Handbook."

Resident:                                              Forest City Residential Management, Inc.
_____                                Agent for Owner

_____                                By: _____

Date:   23 Sep 11                                      Date:   9/23/11

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_, between Forest City Southern Group, LLC, Owner, and _Amy Wilson_ ("Resident"), regarding property located at _893 Hiuhua_ (the "Premises").

Owner desires to maintain a quality living environment for Resident. To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:** Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures. When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:** In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors. Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth. Use environmentally safe household cleaners. A vacuum cleaner with a HEPA filter will help remove mold spores. Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts. Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible. Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner. Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom. Keep the shower curtain inside the tub or fully close the shower doors when showering. After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out. Run the fan on the furnace to help circulate fresh air. Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection. If condensation forms in the area, wipe it dry. Dry damp clothing as quickly as possible.

    i.  Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

    j.  Do not overfill closets or storage areas. Overcrowding restricts airflow.

    k.  Promptly report to the Neighborhood Management Office:

        i.  Any leak, water damage, or signs of water infiltration;

        ii.  Any malfunction in the heating, ventilation, or air conditioning system;

        iii.  Windows or doors that do not open or close properly;

        iv.  Any areas of visible mold (except very small areas that respond to routine cleaning);

        v.  Musty or moldy odors;

        vi.  Health issues that Resident thinks may be linked to the air quality within the Premises;

        Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3.  **EXISTING MOLD:** If small areas of mold have already formed on non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets – provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4.  **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:** (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5.  **COMPLIANCE:** If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

Resident:                             Forest City Residential Management, Inc.
                                       Agent for Owner

                                         By: _____

Date: 23 Sep 11                     Date: 9/23/11

# THIRD PARTY ALLOTMENT ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _9/23/11_ regarding property located at _295 Fairchild_ (the "Premises"), between Forest City Southern Group, LLC ("Owner") and _Ann Wilson_ (who is the highest ranking military member that will reside in the Premises, referred to in this Addendum as "Resident").

1.  **Payment by Allotment.** Resident agrees to pay Monthly Rent to Owner for the Premises as determined in the Lease Agreement, to be paid by allotment and/or electronic transfer (the "Allotment").

2.  **Managing Agent.** Owner shall contract with a third party managing agent for the processing of all of Resident's Allotment-related starts, stops and changes. The third party managing agent is Military Assistance Company/Fort Knox National Company ("MAC").

3.  **Resident Consent and Authorization.** Resident hereby authorizes Owner to act on behalf of Resident to start, stop and change Resident's Allotment for Monthly Rent under the Lease Agreement. Changes may be made for any valid reason under the Lease Agreement to include, but not be limited to, annual rate adjustments. Resident acknowledges that he/she shall not attempt to make any changes to the Allotment, and agrees that the Allotment may not be canceled prior to the satisfaction of the final Monthly Rent payment due under the Lease Agreement. Any actual or attempted cancellation of the Allotment by Resident is grounds for Owner to terminate the Lease Agreement.

4.  **Documentation.** Resident agrees to execute any and all documents which are necessary to authorize Owner and/or MAC to control the Allotment. Resident understands that he/she may not be permitted to occupy the Premises until the appropriate Allotment documentation has been completed.

Resident: _[signature]_

Forest City Residential Management, Inc.
Agent for Owner

By: _[signature]_

Date: _23 Sep 11_

Date: _9/23/11_

**Ed Williams**

| | |
|---|---|
| From: | kat.quarles@moldtestusa.com |
| Sent: | Friday, March 17, 2017 12:02 PM |
| To: | Ed Williams |
| Subject: | MTUSA |
| Attachments: | Chain of Custody.pdf |

## Booking Info

| Booking Date | Booked by | Inspector Assigned |
|---|---|---|
| 3/17/2017 | Kat Quarles | Ed Williams - Pascagoula MS |

## Schedule Info

| Schedule Date | Schedule Time | Schedule Day |
|---|---|---|
| 3/22/2017 | 2:00 | Wednesday |

## Customer Information

| Customer Name | Customer Phone Number | Site Ownership |
|---|---|---|
| Rushing and Guice | (228) 374-2313 | owner |

| Customer address |
|---|
| 295 Fairchild Drive, Biloxi, MS 39531 |

## Inspection Info

| Type of Test | Base Price | Expedite | Electricity |
|---|---|---|---|
| Pre | $495.00 | No | Yes |

## Site Contact Info

| Name | Contact Number | Relation to Site |
|---|---|---|
| Ann Yarbrouth | (316) 207-4349 | Tenant |

## Additional Information

Wants 2 air samples and 1 additional tape lift.

## Mileage Bonus (if any)

$50.00

AFTER THE JOB, SAME DAY
- Send the samples and fully completed Chain of Custody to the lab





**5 Point Visual Inspection**

Prepared for   Rushing and Guice

Site Address   295 Fairchild Drive

City           Biloxi                    State   MS   Zip   39531

Inspector      Ed Williams

Date           3/23/2017                 Time    2:00 PM

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - We always suggest to have a Direct ID Sample for visible microbial growth.
   - If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

Important: If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

Client Present       Age of Home       Weather        Exterior Temp

Ann Yarbrough   12+ Years   Sunny          85.2°

**52 Point Visual Inspection**

# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☒ |
| 3 | Are gutters present? | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☒ | No ☐ |

Comments: (Note anything visible)

3. GUTTERS ON BACK of house NEED to be CLEANED.

5. Front of house siding shows reminants of a climbing plant.

5. Bushes Along front Left of house ARE to close to house.

## ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

NONE

## Foundation Type

| 10 | Basement ☐ | Crawl ☐ | Slab ☒ |
|---|---|---|---|

## Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☐ | No ☒ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:

NONE



**52-Point Visual Inspection**

## Crawl Space (Enter only if safe to do so)

| | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☐ | No ☒ |
| 15 | Is there microbial growth? | Yes ☐ | No ☐ |
| 16 | Is there a vapor barrier? | Yes ☐ | No ☐ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☐ | No ☐ |
| 18 | Is the crawl space totally encapsulated? | Yes ☐ | No ☐ |
| 19 | Is there room for you to crawl? | Yes ☐ | No ☐ |
| 20 | Is there any rot? | Yes ☐ | No ☐ |
| 21 | Is the insulation intact? | Yes ☐ | No ☐ |
| 22 | Is the insulation wet? | Yes ☐ | No ☐ |
| 23 | Is the duct work intact? | Yes ☐ | No ☐ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☐ |
| 25 | Are the floor joists intact? | Yes ☐ | No ☐ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☐ |
| 27 | Are any vents blocked off? | Yes ☐ | No ☒ |

Comments:

N/A



## 52-Point Visual Inspection

# INSIDE

## Microbial Activity

| | | Yes | No |
|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | Yes | No |
| 31 | Is there a musty odor present? | Yes | No |
| 32 | Are there any water marks? | Yes | No |

Comments:
30- AC VENTS IN BR 2 & 3
30 - HVAC, CONDENSATE LINES, Ductwork IN Garage
30- ITEMS IN STORAGE Rm.
31- STORAGE Room

32- UPSTAIRS BATHroom Door Jam
32- Garage - Hot water heater Foundation

## Attic

| 33 | Anything suspicious? (including lack of proper ventilation) | Yes ☐ No ☒ |
|---|---|---|

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.

Comments:
NONE

## Kitchen and Laundry

| | | Yes | No |
|---|---|---|---|
| 34 | Is the dryer ventilation intact? | Yes ☒ | No ☐ |
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☒ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☒ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☒ |

Comments:
Kitchen HVAC REGISTER is Dirty / showing signs of
microbial growth.

© MMIT USA 2016

MTUSA

52-Point Visual Inspection

## Bedroom/Office(s)

**indicate Name of Bedroom/offices

| | R01 MSTR BR | R02 Bedroom 2 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☒  No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 40  Are HVAC vents clean? | Yes ☒  No ☐ | Yes ☐  No ☒ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☒ | Yes ☒  No ☐ |

**indicate Name of Bedroom/offices

| | R03 STORAGE | R04 Bedroom 3 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 40  Are HVAC vents clean? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☒ | Yes ☐  No ☒ |

**indicate Name of Bedroom/offices

| | R05 LIVING Room | R06 DINING Room |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☒ | Yes ☐  No ☒ |
| 40  Are HVAC vents clean? | Yes ☒  No ☐ | Yes ☐  No ☒ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☒ | Yes ☐  No ☒ |

**indicate Name of Bedroom/offices

| | R07 | R08 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 40  Are HVAC vents clean? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☐ | Yes ☐  No ☐ |

**indicate Name of Bedroom/offices

| | R09 | R10 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 40  Are HVAC vents clean? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☐ | Yes ☐  No ☐ |

**indicate Name of Bedroom/offices

| | R11 | R12 |
|---|---|---|
| 38  Any microbial activity around windows? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 39  Any water stains on ceiling/walls/carpets? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 40  Are HVAC vents clean? | Yes ☐  No ☐ | Yes ☐  No ☐ |
| 41  Is the paint or plaster cracking? | Yes ☐  No ☐ | Yes ☐  No ☐ |

Comments:

38/41- Microbial growth & paint cracking on and around (R02) the HVAC register in Bedroom #2.

R03-40- No register/vent in room.
R04-40- Visible microbial growth on HVAC vent.
R03- Microbial growth on multiple items located in Storage Rm
R06- Visible microbial growth on HVAC vent.

## USA    52-Point Visual Inspection

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

| | | Bathroom 1 | | Bathroom 2 | |
|---|---|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒ | No ☐ | Yes ☒ | No ☐ |
| 43 | Any leaks under the sink? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒ | No ☐ | Yes ☒ | No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ | No ☒ | Yes ☐ | No ☒ |
| 46 | Any leaks around hot the water heater? | Yes ☒ | No ☐ | Yes ☐ | No ☒ |

Comments:
BATHROOM 3 (½ BATH)
42 - YES
43 - No
44 - N/A
45 - N/A

46. - HOTWATER HEATER IN GARAGE - WATER STAINS ON BASE.
Indications of previous Leaks.

## HVAC

| | | | |
|---|---|---|---|
| 47 | Is there a return vent? | Yes ☒ | No ☐ |
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐ | No ☒ |

Comments: (Note condition of return and ducts)
RETURN VENT NEEDS CLEANING
DUCTS IN GARAGE HAS microbiaLgrowth
CONDENSATE LINES & GARAGE AC unit have Areas of microbial Growth.

## Relative Humidity Indoors

49. Readings /Comments:
64% RH @ 78.1°

## Moisture Indoors

50. Readings /Comments:
WALLS - <5%
FLOOR - <9%

## 52-Point Visual Inspection

Do You Recommend Remediation? Yes ☒   No ☐   Possibly ☐

49. Explanation:

Microbial growth in multiple areas associated with HVAC system including vents and ducts as well as items in storage area.

## Issues of Concern

50. Comments:
Items in 49 above
Bushes touching side of house
Clogged gutters & missing downspout extensions
Algie growing next to foundation & microbial growth on brick.

51. Recommended Preventative Measures:
Clean Gutters
Change HVAC Filter monthly
Add downspout extensions
Trim bushes from side of house
Add HVAC duct in upstairs storage area
Have HVAC system serviced & cleaned

## Inspector Recommends These Areas to Test

52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.
Surface growth on items in Storage Rm
Vents in Kitchen, Dining, Bedroom 2/3
Condensate Lines in Garage
Vent Ductwork in Garage



## 52 Point Visual Inspection

### THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days. *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   *If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with _____ at MTUSA.

Please have Customer Initial the following:

I agree to pay $ _____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.

Initial:

### Signatures

Inspector Signature:

Date: 3/24/2017

Customer Signature:

Date:

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?    Yes    No

I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.

Inspector Signature:

Date: 3/24/2017

Customer Signature:

Date:

© Mold Test USA 2016

# Mold Test USA Customer Agreement

Property Address: _____

The inspector recommends, and you agree, that the following areas be sampled:

PRICING
Base Rate: $ 495.00
(includes 2 samples)
Additional samples: $85 ea.

| Location of sample | Type of Sample (circle) | # of samples in area | |
|---|---|---|---|
| 1. OUTSIDE - FRONT YARD | (Air)/Swab/Tape/bulk material | 1 | |
| 2. 2nd Floor HALL | (Air)/Swab/Tape/bulk material | 1 | |
| 3. Music Case - STORAGE | (Air)/Swab/Tape/bulk material | 1 | 85.00 |
| 4. | Air/Swab/Tape/bulk material | | |
| 5. | Air/Swab/Tape/bulk material | | |
| 6. | Air/Swab/Tape/bulk material | | |
| 7. | Air/Swab/Tape/bulk material | | |
| 8. | Air/Swab/Tape/bulk material | | |
| 9. | Air/Swab/Tape/bulk material | | |
| 10. | Air/Swab/Tape/bulk material | | |

The inspector suggested the following areas below to be tested in which you chose not to have tested.

_____   **Customer Initials** _____

EXPEDITED?  YES (NO) circle)  Waived Fee _____     Expedited Amount: $ _____

### Total Price for services rendered:     $ 580.00

Payment Method: _____     **Transaction ID:** _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A GUARANTEE OF ANY KIND, NOR DOES IT SUBSTITUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results with you and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA. By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.                    **Customer Initials** _____

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

_____   3/23/17          _____   3/23/2017
Customer's Signature        Date                Inspector's Signature       Date

877-554-6653  admin@moldtestusa.com  Mon-Fri 9am-7pm EST

Newton Laboratory

# NML-20170327-Rushing and Guice - 295 Fairchild Dr

Spore Analysis Completed for



1101 1st Street South EXT, Suite B, Columbia, SC 29209
803-776-0562
admin@moldtestusa.com

| | |
|---|---|
| Collected Date | 3/22/2017 |
| Collected Street Address | 295 Fairchild Dr |
| Collected & Relinquished by | Ed Williams |
| # of Sample Sent | 3 |
| # of Sample Received & Accepted | 3 |
| Sample(S) Received & Accepted on | 03/27/2017 |
| Sample(S) Received & Accepted by | Crystal Hernandez |
| Sample(S) Analyzed on | 03/27/2017 |
| Sample(S) Analyzed by | Janna Komorowski |
| Report Approved by | Crystal Hernandez |
| Report/Test Type | Standard |

Thank you for using Newton Microbial Laboratory for your diagnostic needs. Our entire staff strives to ensure everyone receives the utmost professional performance. The customer, and any other individuals who rely upon this report, understand that Newton Microbial Laboratory, its employees, and representatives Newton Microbial Laboratory bear no responsibility for its results whatsoever, and understands that this report was rendered independent to the client relationship itself. The client is solely responsible for the interpretation. The results of this analysis pertain to only the sample or the specimens tested and referred to in this examination of any type as this is the subject or source of frequency. Newton Microbial Laboratory makes no claims implied warranties in association of the utmost warranty. Newton Microbial Laboratory retains the right to warranty of one of said complications from renderings this analysis nor completions Newton Microbial Laboratory or its employees are not liable for incidental or consequential damages arising out of the use of these test results.

Spore Analysis Completed by

Janna Komorowski
Laboratory Director, B.A. in Biological Sciences

Newton Laboratory

Crystal Hernandez
Operations Director, B.A. in Biology

1101 1st Street South EXT Suite C, Columbia SC 29209

Newton
Laboratory

| Property/Consumer Name | Rushing and Guice - 295 Fairchild Dr | Site Street Address | 295 Fairchild Dr | Site City | Biloxi | Site State | MS | Site Zip | 39531 |
|---|---|---|---|---|---|---|---|---|---|
| Company Email | (illegible) | Company Phone Number | 803-776-0562 | Date Collected | 3/22/2017 | Date Received | 03/27/2017 | | |
| Company Address | 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | Company Name | Mold TEST USA | Sample Collected by | Ed Williams | Date Analyzed | 03/27/2017 | | |

| Newton ML Sample ID | CAE20170327008S001AS | | | CAE20170327008S002AS | | | |
|---|---|---|---|---|---|---|---|
| Sample Name/Location | Sample #1 Outside | | | Sample #2 2nd Story Hall | | | |
| Volume (L) | 150 | | | 150 | | | |
| Background | 3 | | | 3 | | | |
| Analyt. Sensitivity 100X (ct/m³) | 7 | | | 7 | | | |
| Analyt. Sensitivity 400X* (ct/m³) | 13* | | | 13* | | | |
| Sample Type | Spore Trap | | | Spore Trap | | | |

| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total | |
|---|---|---|---|---|---|---|---|
| Alternaria | 4 | 27 | 1.28% | 3 | 20 | 2.70% | |
| Ascospores | 3 | 20 | 0.96% | 3 | 20 | 2.70% | |
| Aspergillus|Penicillium* | 104 | 1,331 | 64.10% | 50 | 640 | 86.49% | |
| Basidiospores | 1 | 7 | 0.32% | Not Detected | | | |
| Bipolaris|Drechslera | 29 | 193 | 9.31% | 1 | 7 | 0.90% | |
| Chaetomium | Not Detected | | | Not Detected | | | |
| Cladosporium* | 27 | 346 | 16.64% | Not Detected | | | |
| Curvularia | 6 | 40 | 1.93% | Not Detected | | | |
| Epicoccum | 4 | 27 | 1.28% | 1 | 7 | 0.90% | |
| Fusarium* | Not Detected | | | Not Detected | | | |
| Memnoniella* | Not Detected | | | Not Detected | | | |
| Myxomycetes|Smuts | 11 | 73 | 3.53% | 6 | 40 | 5.41% | |
| Pithomyces | 1 | 7 | 0.32% | Not Detected | | | |
| Stachybotrys | Not Detected | | | Not Detected | | | |
| Stemphylium | Not Detected | | | Not Detected | | | |
| Torula | Not Detected | | | Not Detected | | | |
| Trichoderma* | Not Detected | | | Not Detected | | | |
| Ulocladium | Not Detected | | | Not Detected | | | |
| Unspecified Spore | 1 | 7 | 0.32% | 1 | 7 | 0.90% | |
| Total | 191 | 2,077 | 100.00% | 65 | 740 | 100.00% | |

| Spore Trap + | Hyphal Fragment | 71 | 473 | | 11 | 73 | | |
|---|---|---|---|---|---|---|---|---|
| | Dander* | na | | | na | | | |
| | Fiber* | na | | | na | | | |
| | Pollen* | na | | | na | | | |
| Comments | | | | | | | | |

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Elevation/Variance |
|---|---|---|---|---|

# Newton Laboratory

Sample #1: Outside

Sample #2: 2nd Story Hall

| | 0 | 200 | 400 | 600 | 800 | 1,000 | 1,200 | 1,400 |
|---|---|---|---|---|---|---|---|---|

- Alternaria*
- Ascospores
- Aspergillus/Penicillium*
- Basidiospores
- Bipolaris/Drechslera
- Chaetomium
- Cladosporium*
- Curvularia
- Epicoccum
- Fusarium*
- Memnoniella*
- Myxomycetes/Smuts
- Pithomyces
- Stachybotrys
- Stemphylium*
- Torula
- Trichoderma*
- Ulocladium
- Unspecified Spore

Newton
Laboratory

## Spore Trap Analysis Explanation

| | |
|---|---|
| Volume | Flow Rate * Flow Rate Minute |
| Background | None: Recollect |
| | 1: <5% |
| | 2: 5% ≤ Background Coverage < 25% |
| | 3: 25% ≤ Background Coverage < 70% |
| | 4: 70% ≤ Background Coverage < 90% |
| | 5: 90% ≤ Background Coverage < 100%, Recollect |
| Cts/M³ | Spore Counts per Cubic Meter |
| Hyphal Fragment | Fragments of hyphae. Can be an additional indicator of possible mold presences |
| Unspecified Spore | Less commonly identified spore types, other than those listed on the report |
| Limit of Detection | 1 spore count per coverage examined area |
| Sample Type | |
| Spore Count | Spore Trap Cassettes  Identification & Enumeration of Fungal Spores |
| Spore Count+ | Spore Trap Cassettes  Identification & Enumeration of Fungal Spores |
| | + Total Dander, Fiber, and Pollen Count |

Spore Trap Analytical Report Method

NML-SAM-1611, adapted from ASTM D7391-9

* Uncertainty available upon request



**Newton Laboratory**

| Site Name | | Site Address  See Address | Site City | Site State | Site Zip |
|---|---|---|---|---|---|
| Rushing and Gulce - 295 Fairchild Dr | | 295 Fairchild Dr | Biloxi | MS | 39531 |
| Company Email | | Company Phone Number | Date Collected | Date Received | |
| admin@moldtestusa.com | | 803-776-0562 | 3/22/2017 | 03/27/2017 | |
| Company Address | | Company He Company Name | Sample Collected by | Date Reported | |
| 1101 1st Street South EXT. Suite B, Columbia, SC 29209 | | Mold TEST USA | Ed Williams | 03/27/2017 | |

| | |
|---|---|
| Newton ML Sample ID | CAE20170327008S001TS |
| Sample Name / Location | Storage Rm - Case |
| Sample Type | Direct ID - Tape |

| Organism | Category | Trace 1-10 | Light 11-100 | Med 101-1000 | High 1001+ | | | |
|---|---|---|---|---|---|---|---|---|
| Alternaria | ND | | | | | | | |
| Ascospores | ND | | | | | | | |
| Aspergillus \| Penicillium | High | | | | | | | |
| Basidiospores | ND | | | | | | | |
| Bipolaris \| Drechslera | ND | | | | | | | |
| Chaetomium | ND | | | | | | | |
| Cladosporium | ND | | | | | | | |
| Curvularia | ND | | | | | | | |
| Epicoccum | ND | | | | | | | |
| Fusarium | ND | | | | | | | |
| Memnoniella | ND | | | | | | | |
| Myxomycetes \| Smuts | ND | | | | | | | |
| Pithomyces | ND | | | | | | | |
| Stachybotrys | ND | | | | | | | |
| Stemphylium | ND | | | | | | | |
| Torula | ND | | | | | | | |
| Trichoderma | ND | | | | | | | |
| Ulocladium | ND | | | | | | | |
| Unspecified Spore | ND | | | | | | | |

ND = Not Detected

| | |
|---|---|
| Hyphal Fragment | Moderate |
| Background Debris | Light |
| Comments | |

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Color Code |
|---|---|---|---|---|

Newton
Laboratory

# Direct Identification Explanation

**Direct ID**

| | | |
|---|---|---|
| Trace | Spore Count less than 10 | |
| Light | Estimated Spore Counts between 11 and 100 | |
| Medium | Estimated Spore Counts between 101 and 1000 | |
| High | Estimated Spore Counts above 1000 | |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

**Unspecified Spore**     Less commonly identified spore types, other than those listed on the report

**Sample Type**

| | | |
|---|---|---|
| Direct ID-Swab | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Swab+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Tape | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Tape+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Bulk | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Bulk+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |

**Direct Analytical Report Method**
NML-SAM-1611

Newton
Laboratory

Newton Report ID
20170327 Rushing and Gupe - 255 Fairchild Dr slam.

   

## Growth & Distribution

- Alternaria is one of the most common and widely distributed molds on the planet (2). The reproductive spores become airborne easily and are prolific in the atmosphere worldwide.
- **Growth Rate:** Rapid Mature with 0.5 to 8 days (34)
- **Water activity:** 0.85-0.88 (1)
- **Outdoors:** In the outdoor environment, Alternaria is found in soil, water and plant material. It plays an important role in vegetable matter decomposition (1). Airborne Alternaria spore counts are often higher around farming and agricultural operations, particularly during harvesting processes when spores are released into the air in large numbers. (3) It is well studied as a plant pathogen having saprophytic effects on a wide variety of vegetation and is often the source of early blights in crops (2). It reaches peak concentrations during late summer and fall (2).
- **Indoors:** Alternaria can be found growing indoors on textiles, dust, wood, carpeting, flooring, drywall or gypsum board, wall paper, furniture, and other cellulose materials. It can be found in humidifiers, heating and air conditioning units, inside of ductwork, and surrounding damp areas i.e. sinks, showers, and windows(1).

## Health Effects

- **Allergenic**
  - Considered by some to be among the most common mold allergens in the US (1).
  - Alternaria can cause allergy symptoms following ingestion, inhalation, injection or direct contact.
  - Alternaria spores are airborne allergens (1). Reactions due to inhalation may increase during peak concentration times in late summer and early fall.
  - Inhalation of high concentrations by sensitive individuals may manifest in Type I and Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III).

- **Pathogen**
  - Invasion is rare but can occur, particularly in immunocompromised individuals. Cases of onychomycosis (nail infection), sinusitis, ulcerated cutaneous infections, keratitis, phaeohyphomycosis, as well as osteomyelitis and peritonitis in patients undergoing peritoneal dialysis have been reported (1,4).
  - Can occasionally cause phaeohyphomycosis (fungal infection), usually in subcutaneous tissue (6).

- **Toxins/ Metabolites**
  - Alternariol (antifungal uses), AME (alternariol monomethylether), tenuazonic acid, & altertoxins (1)

Found in Sample(s)
AIR          •Sample #1 Outside•Sample #2 2nd Story Hall•••••••••••
DIRECT       •••••••••••••••••

(List of references can be found at http://newton-laboratory.com/glossary

Newton
Laboratory




## Ascospores

### Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.

- Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.
- Outdoors: Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.
- Indoors: Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

### Health Effects

- Allergen
  - Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)
  - Reactions due to spore inhalation may increase following rain or high humidity. (5)
  - Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).
- Pathogen
  - Some types can be pathogenic; dependent upon genus and species.
- Toxins\Metabolites
  - Vary greatly depending on genus and species.

Read as Sample)
AIR          •Sample #1 Outside•Sample #2 2nd Story-Hall••••••••••••
DIRECT       •••••••••••••••••

( )list of references can be found at http://newtonlaboratory.com/glossary

Newton
Laboratory

Newton Report ID
20170327 Rushing and Guice - 295 Fairchild Dr.xlsm

# Aspergillus/Penicillium



**Growth & Distribution [7]:**

— Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Mature colonies are capable of quickly producing large numbers of spores. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."

- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower[6].
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates- particularly plant materials such as cereals, grains, decaying wood, and soil [7].
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods [7]. Penicillium is used in cheese production and is responsible for the veins in blue cheese.

**Health Effects**

- **Allergen:**
  - Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.
  - Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.
  - Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen (6,7):**
  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes. [6]. In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) I *P. marnefei* can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**
  - Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

Found in Sample(s)

AIR          •Sample #1 Outside•Sample #2 2nd Story-Hall•••••••••••••

DIRECT   •Storage Rm – Case•••••••••••••••

(List of references can be found at http://newtonlaboratory.com/glossary)

# Basidiospores



**Growth & Distribution:**

- Basidiospores are spores produced by the division of Fungi known as Basidiomycota. These spores are unique for lacking septation, containing bilateral symmetry, and often having a visible pore at the site of detachment from the basidium (7). This is a large group of organisms consisting of a large number of individual genera & species. Distribution is world-wide with the prevalence in any given area varying for each genus and species. Like ascospores, basidiospores disperse using water droplets. Therefore, airborne spore concentrations are often higher following rain or high humidity. This division includes edible mushrooms.

- **Outdoors:** Basidiospores are found growing on plant material, organic debris, and soil. Many species of basidiospores are known to be plant pathogens.

- **Indoors:** Basidiospores may be found growing on damp materials. Colonies may grow given sufficient access to water (leaks, flooding, high humidity, or surrounding plumbing, heating/air conditioning components, appliances, house plants, etc.).

**Health Effects:**

- **Allergenic:**

  – Exposure to these spores is commonplace in both indoor and outdoor environments. Nonetheless they are also potentially allergenic. Allergic responses may occur following inhalation, ingestion, or direct contact. Reactions due to inhalation may be increased following rain or high humidity when spore concentrations are often elevated.

  – In sensitive individuals, typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogenic:**

  – Invasion is not typical but can occur, particularly in the immunocompromised or immunosuppressed. These infections can includes sinitus, keratitis, phaeohyphomycosis, & peritonitist.

- **Toxins\Metabolites:**

  – Mycotoxins vary depending on genus and species. They are especially relevant in edible fungi of this division such as mushrooms.

    - Common sources of mushroom poisoning include *Amnita, Lepiota, Coprinus, & Psilocybe*

Found in Sample(s)
AIR    ►Sample #1 Outside••••••••••••••
DIRECT    ••••••••••••••••••

[ List of references can be found at http://newtonlaboratory.com/glossary ]

Newton Fungal Assessment Report V201611.2
©2013-2017 Newton Microbial Laboratory

Page 10 of 16

Newton
Laboratory

# Bipolaris/Drechslera



## Growth & Distribution:

- Bipolaris, Drechslera, Exserohilum, & Helminthosporium are dematiaceous fungi, producing spores which are elongate, cylindrical, often with numerous septations or cells. These genera are grouped together due to spore similarity. These spores are common in both indoor and outdoor environments. They are found world wide with some species being exceptionally tolerant of dry environments (6).

- **Growth Rate:** Rapid – Mature within 5 days (6)

- **Water Activity:** 0.80 (this is a generalized number for common molds) (26)

- **Outdoors:** These molds are most commonly found on grasses, grains and other plant materials. Bipolaris can be a plant pathogen causing spots, blights, rots, and other symptoms in staple crops like rice, wheat, and sorghum. In the past, plant disease caused by Bipolaris invasion has caused starvation of large human populations. In 1943-1944 the Bengal famine in India was caused by *Bipolaris oryzae* disease in rice. In the 1970s, *Bipolaris maydis* was responsible for a devastating leaf blight resulting in huge losses of corn crops in the USA & UK. (11)

- **Indoors:** These mold may be found on water damaged materials, food stuffs, houseplants, and other organic materials.

## Health Effects:

- ### Allergenic:

  - These molds are highly common in both indoor and outdoor environments; most people have some level of exposure on a daily basis.

  - In sensitive individuals can manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5).

- ### Pathogenic:

  - Bipolaris (rapid growth – mature within 5 days) can be pathogenic in rare instances, particularly in immunocompromised. May invade bone, cornea (keratomycosis), skin, aorta, lung, central nervous system or cause brain lesions (6).

  - Exserohilum (rapid growth – mature within 5 days) can cause phaeohyphomycosis (infection of mycelial/hyphae of dematiaceous fungi), most commonly in nasal sinuses, skin, subcutaneous tissue, and cornea. Rare reports of fatal disseminated infection (6).

- ### Mycotoxins/Metabolites:

  - Cytochalasin, sporidesmin, sterigmatocystin (7)

Powder Sample(s)
AIR   •Sample #1 Outside•Sample #2 2nd Story-Halls••••••••••••
DIRECT   ••••••••••••••••••

Newton Fungal Assessment Report V0105317-2
©2013-2017 Newton Microbial Laboratory

(1)list of references can be found at http://newtonlaboratory.com/glossary

Newton
Laboratory

# Cladosporium



## Growth & Distribution:

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).
- Growth Rate: Moderately Rapid – Mature within 7 days. (6)
- Water Activity: 0.85-0.88 (1)
- Outdoors: Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (*C. cladosporioides*) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).
- Indoors: Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

## Health Effects:

- Allergen:
  - Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
- Pathogen:
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).
- Mycotoxins/Metabolites:
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

Found in Sample(s)
AIR              •Sample #1 Outside•••••••••••••
DIRECT        ••••••••••••••••

{ list of references can be found at: http://newtonlaboratory.com/privacy

Newton
Laboratory

 

## Curvularia

### Growth & Distribution

- Curvularia is found world-wide with a particular preference for the tropics and warmer climates (7). Spores usually have a unique curved shape caused by an enlarged central cell (2). Airborne spores are common in both indoor and outdoor environments worldwide.
- **Growth Rate:** Moderately rapid - 4 to 12 days (32)
- **Water activity:** 0.80 (this is a generalized number for common molds) (26)
- **Outdoors:** Curvularia is typically seen growing on plant material. They are weakly pathogenic to plants and are the cause of leaf spots, seedling blight, and failing of seedling germination (2).
- **Indoors:** Curvularia may be found growing on materials containing cellulose such as woods and grains. Growth is less frequent indoors but may be seen on food.(7)

### Health Effects:

- **Allergen:**
  - Poorly studied but believed to be an allergen and irritant (13).
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Believed to cause corneal infections in the immunocompromised (14).
  - Opportunistic infections of cornea and sinuses, nails, subcutaneous tissue, and systemic organs. Dissemination to the brain can occur rarely. (6)
  - Can be causal agent in mycetoma (6):
    - Infections of subcutaneous tissue and skin. Untreated, chronic infections may progress to involve muscle, fascia & bone. Typically seen on the lower leg or foot, rarely disseminated.
    - Fungi enters the skin via wound, a nodule slowly develops into a tumor or abnormal tissue mass beneath the skin, cavities are formed within the mass and discharge occurs.
    - This is a rare condition which is not contagious. (6) Most infections occur in immunocompromised hosts. (2)

- **Toxins/Metabolites:**
  - Some toxins produced- mainly studied in plants.

Found in Sampled
AIR              •Sample #1 Outside••••••••••••••
DIRECT        ••••••••••••••••

( ) List of references can be found at: http://newtonlaboratory.com/glossary

Newton
Laboratory

Newton Report ID
20170517 Rushing and Grace - 255 Fairchild Dr.xlsm


# Epicoccum



### Growth & Distribution

-- Epicoccum is found worldwide.  Spores are large with distinctive, highly septate morphology and dark brown color (7). Spores are dispersed easily by the wind.  Airborne concentrations are generally higher on dry, windy days with higher counts occurring later in the day (1).  Spores are common  in both outdoor  and indoor air.

* **Growth Rate:** Moderately Rapid -- Mature within 7 days (6)
* **Water Activity:** 0.86-0.90 (1)
* **Outdoors:** Epicoccum is most often found on aging or decaying plants.  It is known to invade various parts of dead plants such as the seeds of corn, barley, oats, & wheat as wells as beans and surrounding soil.  Can also invade insects. (7)
* **Indoors:** Found on cellulose materials (e.g. gypsum boards, floors, paper, woods, cardboard) and other organic materials (e.g. house plants, dust, and occasionally human  skin and sputum(7)).

### Health Effects:

-- **Allergen:**
  * Believed to be an important  spore in inducing fungi-related respiratory allergy disorders.  Increases in outdoor spore concentrations may exacerbate asthma attacks in children.(1)
  * In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis  & allergic sinusitis (Type III). (5)

-- **Pathogen:**
  * Not believed to be infectious in humans (1).
    -- 1 reported  case of fatal haematogenous mycosis in a severely immunosuppressed  allogenenic hematopoietic stem cell transplant recipient possibly attributed to Epicoccum (1).

-- **Toxins/Metabolites:**
  * No toxins or metabolite reported  to be harmful to humans.
  * Produces secondary metabolites and mycotoxins which may be useful as biocontrol agents against bacteria, fungi, & viruses (1).
    -- E.g. *E nigrum* against *Monilinia* spp. on fruit (7).

| Found in Sample(s) | |
|---|---|
| AIR | •Sample #1 Outside•Sample #2 2nd Story-Hall•••••••••••• |
| DIRECT | •••••••••••••••• |

() List of references can be found at  http://newtonlaboratory.com/glossary

 

## Myxomycetes

### Growth & Distribution

— Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 μm)(25).

* **Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).
* **Water Activity:** 0.80 (this is a generalized number for common molds)(26).
* **Outdoors**
   — Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)
* **Indoors**
   — Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

### Health Effects:

— **Allergen:**
   * These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.
   * In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

— **Pathogen:**
   * Unknown

— **Toxins/Metabolites:**
   * Unknown

(counted in Samples)
AIR      •Sample #1 Outside•Sample #2 2nd Story-Hall••••••••••••
Direct    ••••••••••••••••

( ) list of references can be found at http://newtonlaboratory.com/glossary



Newton
Laboratory

 

**Growth & Distribution:**

The colonies grow fairly fast, usually dark (grey to black) in color, while occasionally being yellowish white in color, suede- like to downy, with multicellular conidia (phragmo- or dictyoconidia) forming on peg- like extensions. The conidia extensions are oblong, segmented, verrucose and light brown in color. (4, 29) These spores can be distributed by light winds, rain, and by grazing sheep (27).

- **Growth Rate:** Rapid – Mature within 5 days (6)
- **Water Activity:** 0.80 – 0.89 (28)
- **Outdoors**
  - Can be found on soil and litter (4). During sheep grazing can be found on herbage due to dry litter. (27)
- **Indoors**
  - Can be found on paper (30).

**Health Effects:**

- **Allergen:**
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Can very rarely cause infection in the immunocompromised  (6).
  - Can cause onychomycosis (29).
  - One case of peritonitis reported in a patient with vulvar cancer. (29)

- **Toxins/Metabolites:**
  - Sporidesmin (a mycotoxin which causes facial eczema in sheep)(31).

[ ] list of references can be found at http://newtonlaboratory.com/glossary

