# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**MICHAEL YARBROUGH, JR.; et al.**                          **PLAINTIFFS**

**v.**                                    **CAUSE NO. 1:18cv51-LG-RHW**

**HUNT SOUTHERN GROUP, LLC**
*formerly known as* **Forest City**
**Southern Group, LLC; et al.**                          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BEFORE THE COURT are the [229] Motion for Summary Judgment filed by Defendants Hunt Southern Group, LLC and Hunt MH Property Management, LLC and [234] Motion for Summary Judgment filed by Defendant Forest City Residential Management, LLC. The Motions argue that there are no material issues of fact and the Defendants are entitled to summary judgment on each and every one of Plaintiffs' claims. The Motions are fully briefed. Having considered the submissions of the parties, the record, and relevant law, the Court finds that Defendants' Motions for Summary Judgment should be granted. Plaintiffs' claims will accordingly be dismissed.

## I. BACKGROUND

The plaintiffs in this case – Michael Yarbrough, Jr., Ann Yarbrough, Alizelyia Yarbrough, Michael Yarbrough, III, and James Yarbrough – allege that they were exposed to mold while living in on-base housing at Keesler Air Force Base in Biloxi, Mississippi. This is one of fourteen pending similar cases filed by military families

at Keesler.[1]  The defendants are alleged to have owned or managed the subject on-base housing since its construction was completed in 2011.  Forest City Southern Group, LLC ("Forest City Southern") purchased the structures from the Air Force on September 30, 2011 and obtained a 50-year lease on the land underlying the structures.[2]  In February 2016, the ownership of the housing structures and the lease of the underlying land were purchased from Forest City Southern (presumably by a parent company of Hunt Southern Group, LLC), and Forest City Southern's name was changed to Hunt Southern Group, LLC ("Hunt Southern").  Forest City Residential Management, LLC ("FCRM"), which had managed and operated the property for Forest City Southern, ceased managing and operating the property with its sale, and Hunt MH Property Management, LLC ("Hunt Management") became manager and operator for Hunt Southern.

---

[1] Eleven cases were filed on February 16, 2018: *Pate v. Hunt Southern Group, LLC*, 1:18cv46-HSO-JCG; *Schooling v. Hunt Southern Group, LLC*, 1:18cv47-HSO-JCG; *Fox v. Hunt Southern Group, LLC*, 1:18cv48-LG-JCG; *Cooksey v. Hunt Southern Group, LLC*, 1:18cv49-LG-JCG; *Foster v. Hunt Southern Group, LLC*, 1:18cv50-HSO-JCG; *Yarbrough v. Hunt Southern Group, LLC*, 1:18cv51-LG-JCG; *Poole v. Hunt Southern Group, LLC*, 1:18cv52-LG-JCG; *Stewart v. Hunt Southern Group, LLC*, 1:18cv53-HSO-JCG; *Eden v. Hunt Southern Group, LLC*, 1:18cv54-LG-JCG; *Owen v. Hunt Southern Group, LLC*, 1:18cv55-HSO-JCG; and *Delack v. Hunt Southern Group, LLC*, 1:18cv56-LG-JCG.  *Owen* was dismissed  by stipulation on August 6, 2018, and *Poole* was dismissed by stipulation on February 21, 2019.  Four additional cases have since been filed: *Bean v. Hunt Southern Group, LLC*, 1:18cv393-HSO-JCG; *Rutherford v. Hunt Southern Group, LLC*, 1:18cv394-LG-JCG; *Alexander v. Hunt Southern Group, LLC*, 1:19cv28-HSO-JCG; and *Martin v. Hunt Southern Group, LLC*, 1:19cv172-HSO-JCG.
[2] For a comprehensive explanation of the Military Housing Privatization Initiative, 10 U.S.C. §§ 2871-85, by which housing at Keesler and many other military bases around the country was transferred to private ownership, *see Federico v. Lincoln Military Hous.*, 901 F. Supp. 2d 654, 656-59 (E.D. Va. 2012).

Plaintiffs commenced a lease of their residence on October 1, 2011. (*See* Military Lease Agreement 1, ECF No. 196-1.) Plaintiffs assert they repeatedly requested that Defendants address maintenance concerns involving mold and water damage in their residence. Defendants sent maintenance technicians, who reported that the mold and leaks were resolved. However, say Plaintiffs, Defendants never actually fixed the cause of the mold – air conditioning ductwork that sweat because it was poorly insulated – instead simply cleaning up the visible mold with soap and water each time. Plaintiffs contend that Defendants' agents fraudulently misrepresented that mold problems had been rectified when, in fact, they had not. Plaintiffs state that because of Defendants actions and inactions, they were exposed to elevated levels of toxic mold. As a result, Plaintiffs say they were forced to leave their home and suffered and continue to suffer physical and emotional injuries, medical expenses, and property damage.

Plaintiffs assert claims for negligence, gross negligence, breach of contract, civil conspiracy, alter ego, fraudulent concealment, intentional endangerment, constructive eviction, violation of § 3951 of the Servicemembers Civil Relief Act ("SCRA"), breach of agreement to repair, and third-party beneficiary breach of contract.

The Motion for Summary Judgment filed by Hunt Southern and Hunt Management argues that they are entitled to summary judgment because, among other things, (1) Plaintiffs have put forward no evidence that mold present in their home rendered it dangerous or unsafe, (2) Plaintiffs cannot establish that the Hunt

Defendants breached a duty of care because they do not have the necessary expert testimony, (3) Plaintiffs cannot establish that any of their injuries were proximately caused by mold exposure, (4) Plaintiffs cannot establish that the Hunt Defendants breached the lease agreement, (5) Plaintiffs cannot establish an underlying tort for a civil conspiracy claim, (6) Plaintiffs cannot establish a claim for constructive eviction or SCRA claim because they were never evicted (constructively or otherwise), (7) Plaintiffs' third-party beneficiary claim is expressly disclaimed by the Master Development and Management Agreement entered into by the Air Force and Forest City Southern, and (8) Plaintiffs claims for alter ego, fraudulent concealment, and intentional endangerment are not independent causes of action. FCRM makes the same arguments in its Motion for Summary Judgment, but also asserts that it was never party to the lease agreement Plaintiffs signed.

## II. DISCUSSION

a. <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he nonmovant must go beyond the pleadings and designate

specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

"A genuine dispute of material fact means that 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the evidence presented by the nonmovant "'is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 249). In deciding whether summary judgment is appropriate, the Court views the evidence and inferences in the light most favorable to the nonmoving party. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

b. <u>Analysis</u>

A threshold issue not directly addressed by the parties is the impact of Keesler Airforce Base's status as a federal enclave on the choice of substantive law for Plaintiffs' personal injury claims. *See United States v. Tax Comm'n of Miss.*, 421 U.S. 599, 600-01 (1975). "Generally, when an area in a State becomes a federal enclave, 'only the [state] law in effect at the time of the transfer of jurisdiction continues in force' as surrogate federal law." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) (quoting *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940)). "Existing state law typically does not continue in force, however, to the extent it conflicts with 'federal policy.' And going forward, state law

presumptively does not apply to the enclave." *Id.* (citations omitted). "This approach ensures 'that no area however small will be without a developed legal system for private rights,' while simultaneously retaining the primacy of federal law and requiring future statutory changes to be made by Congress." *Id.* (quoting *Sadrakula*, 309 U.S. at 100; citing *Tax Comm'n of Miss.*, 412 U.S. at 370 n.12).

Congress has eliminated the need to determine Mississippi personal injury law at the time Keesler became a federal enclave. 28 U.S.C. § 5001 provides that current state law governs actions for personal injuries that occur "in a place subject to the exclusive jurisdiction of the United States within a State." 28 U.S.C. § 5001; *see Rodriguez v. Nationwide Homes, Inc.*, 765 F. App'x 782, 785 (10th Cir. 2018); *La. United Bus. Ass'n Cas. Ins. Co. v. J & J Maint., Inc.*, 133 F. Supp. 3d 852, 863-64 (W.D. La. 2015). Thus, § 5001 adopts and incorporates current Mississippi law governing personal injury actions. *Vasina v. Grumman Corp.*, 644 F.2d 112, 117 (2d Cir. 1981) (addressing § 5001's predecessor, 16 U.S.C. § 457); *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1468, 1473 (D. Kan.), *on reconsideration,* 846 F. Supp. 1482 (D. Kan. 1994), *aff'd,* 43 F.3d 1484 (10th Cir. 1994) (same).

    i. Plaintiffs' Tort Claims Fail Because They Do Not Have Expert
       Evidence of Specific Causation

Plaintiffs' negligence and gross negligence claims are claims for personal injury caused by their alleged exposure to toxic mold in their leased premises. "Such a claim is one for toxic tort." *Shed v. Johnny Coleman Builders, Inc.*, 761 F. App'x 404, 406 (5th Cir. 2019). "In any tort case, identifying and proving the source of the harm that proximately caused a plaintiff's injuries is essential." *Smith v.*

*Union Carbide Corp.*, 200 So. 3d 1035, 1041 (Miss. 2016) (quoting *Miss. Valley Silica Co. v. Reeves*, 141 So. 3d 377, 382 (Miss. 2014)). "To establish causation in toxic tort cases, general causation first must be shown, then specific causation. General causation means that a substance is capable of causing a particular injury; specific causation looks to whether the substance caused the specific plaintiff's injury." *Shed*, 761 F. App'x at 406 (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)); *see also Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir. 1999).

"Under Mississippi law, actions involving 'medically complicated' injuries require expert testimony on causation." *Savage v. Pilot Travel Centers, L.L.C.*, 464 F. App'x 288, 290-91 (5th Cir. 2012); *see also Cole v. Superior Coach Corp.*, 234 Miss. 287, 106 So.2d 71, 72 (1958) ("In all but the simple and routine cases . . ., it is necessary to establish medical causation by expert testimony."). Plaintiffs' mold-exposure claims allege medically complicated injuries, which require expert testimony on causation.[3] *See Curtis*, 174 F.3d at 670 ("We recognize that '[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case.'"); *Garrett v. City of Tupelo, Miss.*, No. 1:16cv197-DMB-DAS, 2018 WL 3341198, at *8 (N.D. Miss. July 6, 2018) ("Causation in a mold case is not within common knowledge and expert medical

---

[3] Plaintiffs agree that expert testimony is required to prove general and specific causation in their toxic tort case. (*See* Resp. Opp. Defs' Mot. Summ. J. 13, ECF No. 254.)

testimony will be required to establish general and specific causation."); *Ingram v. Guideone Mut. Ins. Co.*, No. 2:06cv117-KS-MT, 2007 WL 4165361, at *5 (S.D. Miss. Nov. 19, 2007) ("In order to prevail on their claims for physical injury, the plaintiffs must demonstrate 'by a reasonable medical probability through expert testimony that [their] alleged injuries were caused by mold exposure.'"); *Childers v. Ill. Cent. R.R. Co.*, __ So. 3d __, 2019 WL 2428777, at *2 (Miss. Ct. App. June 11, 2019) ("The causal link between a cancer diagnosis and exposure to harmful toxins, however, often requires the expertise and knowledge of a medical expert.").

Plaintiffs offer the testimony of two experts. However, neither provides evidence of specific causation. Joe E. Morgan is a contractor with significant construction and construction-consulting experience. His opinion is that defects in the way the HVAC system was installed in Plaintiffs' residence caused moisture issues, and Defendants took too long to address these moisture issues.[4] (*See* Morgan Report, ECF No. 206-1; Morgan Depo. 50, ECF No. 206-2 (ECF pagination).) Mr. Morgan's opinion cannot establish general or specific causation for Plaintiffs' mold-exposure claims. Dr. Paul Goldstein, Ph.D. is a professor of genetics and toxicology in the Department of Biological Sciences at the University of Texas, El Paso. Dr. Goldstein opines that the Yarbroughs have experienced symptoms – chest pain, sinusitis, congestion, respiratory problems, rhinitis, fatigue, headache, rash, allergic reaction, dermatitis, nausea, vomiting, and cough –

_____

[4] Defendants have filed a [206] Motion to Exclude the Opinions and Testimony of Joe E. Morgan, Jr., which the Court need not rule upon in order to resolve Defendants' summary judgment motions.

consistent with exposure to toxins released by Aspergillus and Penicillium mold spores found in their residence. (*See* Goldstein Report 3-5, ECF No. 216-1.) He also offers his conclusions that Plaintiffs' exposure to these toxins more likely than not caused their symptoms. (*Id.* at 5.) However, the Court has determined in a separate, concurrently-entered Memorandum Opinion and Order that this second opinion – which concerns specific causation – must be excluded as unreliable under Federal Rule of Evidence 702.

Dr. Goldstein is prepared to state that the symptoms collectively experienced by members of the Yarbrough household are consistent with the symptoms caused by exposure to toxins released by Aspergillus and Penicillium mold spores. He did not determine that the specific mold(s) to which individual plaintiffs were exposed caused the specific symptoms they experienced. He acknowledges that the testimony of a medical doctor is required in order to determine whether any individual person suffered symptoms *caused* by exposure to mold. The only medical expert opinion offered in this case is that of Dr. Chelle P. Wilhelm, M.D., the Rule 35 medical examiner.[5] Dr. Wilhelm clinically examined each of the Yarbroughs, reviewed their medical records, and concluded "to a reasonable degree of medical certainty" that the Yarbrough's documented and reported symptoms were not

---

[5] Of course, the Court need not consider this evidence because it is Plaintiffs' burden to prove their claims, and the absence of expert evidence on specific causation forecloses their toxic tort claims. Plaintiffs have filed a [226] Motion to Strike the Opinions and Testimony of Chelle Wilhelm, M.D., which the Court need not address in order to resolve Defendants' Motions for Summary Judgment.

caused by exposure to mold in their home at Keesler. (Wilhelm Rule 35 Reports 6, 24, 36, 55, 65, ECF No. 229-20.)

Dr. Goldstein's admissible opinion evidence establishes general causation – that the mold to which Plaintiffs were exposed could produce the symptoms they experienced – but that is all. Plaintiffs' mold-exposure claims require expert evidence on both general and specific causation, but Plaintiffs point to no additional expert medical evidence in the record. In fact, the only medical evidence offered by either party establishes that exposure to mold was not the cause of Plaintiffs' injuries. Without an issue of fact as to specific causation, the Court must grant summary judgment for Defendants on Plaintiffs' negligence and gross negligence claims. *See Shed*, 761 F. App'x at 407 ("Shed's doctors observed that the injuries were *consistent* with mold exposure without concluding that mold was in fact the cause. Therefore, Shed had failed to produce sufficient evidence to create a material issue of fact that the mold in his rental unit caused his physical injury.") (emphasis in original).

ii. <u>Plaintiffs' Civil Conspiracy Claim Fails Because They Cannot Establish an Underlying Tortious Act</u>

The elements of civil conspiracy under Mississippi law are "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result." *Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 739 (5th Cir. 2015) (quoting *Gallagher Bassett Servs., Inc. v. Jeffcoat,* 887 So. 2d 777, 786 (Miss. 2004)). "Mississippi follows the rule of almost all

jurisdictions in uniformly requiring that civil conspiracy claims be predicated upon an underlying tort that would be independently actionable." *Id.* (citations omitted). Because the Court has determined that Plaintiffs' negligence and gross negligence claims do not survive summary judgment, Plaintiffs' civil conspiracy claim must fail for lack of an underlying tort on which to base the conspiracy. Defendants' are entitled to summary judgment on Plaintiffs' civil conspiracy claim.

      iii.   <u>Plaintiffs' Breach of Contract Claim Fails Because They Do Not Identify the Terms or Conditions Supposedly Breached</u>

Although Plaintiffs allege a breach of contract claim in their Amended Complaint (*see* Am. Compl. 11, ECF No. 196), they do not brief such a claim in their [254] Response in Opposition.[6] Under Mississippi law, "[a] breach-of-contract case has two elements: (1) the existence of a valid and binding contract, and (2) a showing that the defendant has broken, or breached it." *Maness v. K&A Enters. of Miss.*, 250 So. 3d 402, 414 (Miss. 2018) (internal quotation marks and citation omitted). A breach is material "where there is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats the purpose of the contract." *Id.* (alteration omitted) (internal quotation marks and citations omitted).

Plaintiffs' Amended Complaint points to the Military Lease Agreement as the contract at issue. The parties do not dispute that it is a valid and binding agreement. In order to defeat summary judgment, Plaintiffs "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for

---

[6] Indeed, Plaintiffs appear to have conceded or abandoned this claim.

trial." *Little*, 37 F.3d at 1075. However, Plaintiffs do not identify the terms or conditions of the lease agreement that Defendants supposedly breached. It is the Plaintiff's burden to ultimately prove their breach of contract claim. *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 527 (Miss. 2019). The Court will not dig through the record to identify facts substantiating Plaintiffs' claims. Defendants are therefore entitled to summary judgment on Plaintiffs' breach of contract claim.

    iv.   <u>Plaintiffs' Breach of the Implied Warrant of Habitability Claims Fail Because They Cannot Establish Proximate Cause</u>

The implied warranty of habitability obligates the landlord to provide "reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant." *Sweatt v. Murphy,* 733 So. 2d 207, 210 (Miss. 1999). A claim pursuant to the implied warranty of habitability is treated as an extension of negligence, requiring proof of duty, breach, causation, and damages. *See Houston v. York*, 755 So. 2d 495, 501 (Miss. Ct. App. 1999); *O'Cain v. Harvey Freeman & Sons, Inc. of Miss.*, 603 So. 2d 824, 833 (Miss. 1991). "As this cause of action sounds in tort, the landlord has available all standard tort defenses including intervening cause and unforeseeability." *Sample v. Haga*, 824 So. 2d 627, 632 (Miss. Ct. App. 2001) (citing *Sweatt*, 733 So. 2d at 211).

Plaintiffs cannot establish a breach of the implied warranty of habitability for the same reasons that they cannot establish claims for negligence: they have failed to produce adequate evidence of specific causation. Plaintiffs do not have expert evidence to demonstrate that their exposure to mold did in fact cause the symptoms

they experienced.  Defendants are therefore entitled to summary judgment on

Plaintiffs' breach of the impliedly warranty of habitability claims.

> v.　Plaintiffs' Breach of Agreement to Repair Claim Fails Because They Do Not Identify A Specific Contract To Do So

Plaintiffs, again, do not address this claim in their [254] Response in

Opposition.  "[Mississippi] caselaw has long held that a landlord/lessor has no

obligation to make repairs to the leased premises, even if they are necessary, in the

absence of a contract to do so." *Dulin v. Sowell*, 919 So. 2d 1010, 1013 (Miss. Ct.

App. 2005) (citing *Ford v. Pythian Bondholders Protective Comm.,* 78 So. 2d 743,

748 (Miss. 1955)); *see also Loflin v. Thornton*, 394 So. 2d 905, 906 (Miss. 1981) ("In

the absence of an express agreement between the landlord and tenant to make

repairs, there is no obligation or duty upon the landlord to do so . . . .").  "[O]nly

where there is an agreement for specific repairs will a breach of that agreement

impose liability for personal injury." *Loflin*, 394 So. 2d at 906.

Plaintiffs point to no specific agreement to make repairs that Defendants

breached.  The only provision in the Lease Agreement dealing with any

responsibility borne by Defendants to make repairs to the rented property obligates

Hunt Southern to "maintain the Neighborhood and the mechanical and electrical

devices within the Premises in a clean, safe, and workable condition."  (Military

Lease Agreement 7, ECF No. 241-3 (ECF pagination).)  A general agreement to

make repairs to leased premises – such as this provision – does not give rise a

breach of an agreement to repair.  *See Rich v. Swaim*, 137 So. 325, 326-27 (Miss.

1931).  Because Plaintiffs have not identified a specific agreement to make

particular repairs, Defendants are entitled to summary judgment on the breach of agreement to repair claim.

> vi. <u>Plaintiffs' Cannot Establish a Claim for Constructive Eviction Because They Had Not Actually Abandoned the Property at the Time They Filed Suit</u>

The Mississippi Supreme Court defines constructive eviction as follows:

> An intentional act or omission of the landlord, or by those acting under his authority or with his permission, that permanently deprives the tenant without his consent of the use and beneficial enjoyment of the demised premises or any substantial part thereof, in consequence of which he abandons the premises, constitutes a constructive eviction.

*Perkins v. Blackledge*, 285 So. 2d 761, 764 (Miss. 1973) (quoting 52 C.J.S. Landlord and Tenant § 455 (1968)). "However, not every deprivation of the beneficial enjoyment of the premises necessarily amounts to a constructive eviction . . . ." *Id.* "[T]he landlord's interference with the tenant's use and enjoyment must be substantial and effectual, material, fundamental, permanent, and intentional." *Id.*

An essential element of a successful constructive eviction claim is that the tenant actually abandons the premises. But Plaintiffs admittedly did not vacate their leased home until February 2019, more than a year after they initially filed suit in the Circuit Court of Harrison County, Mississippi in December 2017. Plaintiffs cannot claim to have been constructively evicted from their home while they continued to reside in the property. *Cf. In re Christopher*, No. 02-10782, 2003 WL 22890099, at *5 (Bankr. N.D. Miss. May 27, 2003) ("The plaintiff was permitted to utilize the [boat] slip until the term of his lease expired. Therefore, the court

must conclude as a matter of law that no constructive eviction occurred.") Their claim accordingly fails as a matter of law.

Additionally, and alternatively, Plaintiffs' constructive eviction claim fails because Defendants offered to relocate Plaintiffs, at no cost to them, months before Plaintiffs vacated the premises. On August 7, 2018, a representative of one of the Hunt defendants contacted Ms. Yarbrough to offer Plaintiffs the opportunity to relocate to another Keesler housing unit at the Hunt defendants' cost. (*See* Aug. 7, 2018 Email Correspondence, ECF No. 252-6.) This relief was explicitly provided for in the Lease Agreement, a provision of which reserves for Hunt Southern "the right to relocate Resident due to . . . habitability conditions." (Military Lease Agreement 8, ECF No. 241-3 (ECF pagination).) The Lease provision further states that the "Owner shall be responsible for the cost of the relocation." (*Id.*)

It appears that this provision in the Lease, once exercised by the Hunt defendants, negated Plaintiffs' ability to bring a subsequent constructive eviction claim. Plaintiffs do not contest the enforceability of this clause. Moreover, they do not contend that the offer was a hollow one – that, for example, no mold-free housing existed on base. Indeed, Plaintiffs do not address either of these defenses raised in Defendants Motion for Summary Judgment. Plaintiffs were offered the opportunity to move from their home to another residence on base, at no expense to them, but elected to remain in their home until February 2019. For these reasons, Defendants are entitled to summary judgment on Plaintiffs' constructive eviction claim.

<u>Plaintiffs Cannot Establish a Violation of § 3951 of the SCRA Because They Cannot Establish a Constructive Eviction</u>

Plaintiffs' claim under the SCRA is, again, one premised upon constructive eviction. Relevant to this case, the SCRA provides that, "[e]xcept by court order, a landlord (or another person with paramount title) may not . . . evict a servicemember, during a period of military service, from premises . . . that are occupied or intended to be occupied primarily as a residence . . . ." 50 U.S.C. § 3951(a)(1)(A). The Court has already determined that Plaintiffs have failed to create a fact issue that would allow a claim for constructive eviction to proceed. Without a constructive eviction, Plaintiffs cannot establish a claim for relief under the SCRA. Defendants are accordingly entitled to summary judgment on this claim.

viii. <u>Plaintiffs' Third-Party Beneficiary Breach of Contract Claim Fails Because the Contracts Plaintiffs Rely Upon Disclaim Their Alleged Third-Party-Beneficiary Status</u>

"A third person may enforce a promise made for his benefit even though he is a stranger to the contract or to the consideration." *Cope v. Thrasher Constr., Inc.*, 231 So. 3d 989, 993 (Miss. 2017) (citation omitted). The third party's right of action "must spring from the terms of the contract itself." *Id.* (citation omitted). Thus,

> (1) When the terms of the contract are expressly broad enough to include the third party either by name as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.

*Id.* (citations omitted). However, "[t]he contracting parties' clear disclaimer of any intent to create third-party rights disposes of any claim that [the contract] grants such rights to [a third party]." *Garrett Enters. Consol., Inc. v. Allen Utils., LLC*, 176 So. 3d 800, 805 (Miss. Ct. App. 2015).

Here, the contracts referenced by Plaintiffs – the Environmental Management Plan agreed to by the Air Force and Hunt Southern (when it was known as Forest City Southern), and the Property Management Agreement entered into by FCSG and Hunt Southern (when it was known as Forest City Southern) – were incorporated into and incorporate, respectively, the Master Development and Management Agreement ("MDMA"). (*See* Master Dev. & Mgmt. Agreement 16, ECF No. 252-1 (ECF pagination) (stating that "[t]he Project Operating Agreement is hereby incorporated into and made part of this Agreement" and noting that an attachment to the Project Operating Agreement are the "Environmental Management Plans"); Property Mgmt. Agreement 2, ECF No. 252-2 (providing that "[o]peration of the Property and the duties and obligations of the Manager and the Owner are subject to the terms and provisions of the AF Project Documents," which includes the MDMA). The MDMA provides in Section 10.15, "Except as otherwise expressly provided with respect to Approved Mortgagees . . . , (1) there shall be no third party beneficiaries to this Agreement . . . ." (Master Dev. & Mgmt. Agreement 45, ECF No. 252-1 (ECF pagination).)

"Pursuant to Mississippi law, the 'No Third-Party Beneficiaries' clause must be enforced as written." *S. Indus. Contractors, LLC v. Neel-Schaffer, Inc.*, No.

1:17CV255-LG-JCG, 2017 WL 5906041, at *3 (S.D. Miss. Nov. 30, 2017).

"Furthermore, the presence of this clause in the contract demonstrates that the

contract was not entered into for the benefit of [Plaintiffs]." *Id.* Plaintiffs cannot

establish a claim premised upon being third party beneficiaries. Defendants are

therefore entitled to summary judgment on this claim.

> ix. <u>Plaintiffs' Fraud Claims Fail Because They Cannot Establish
> Proximate Injury Resulting From an Alleged Affirmative Act of
> Concealment</u>

To state a claim for fraud under Mississippi law, a plaintiff must establish

the following nine elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4)
> the speaker's knowledge of its falsity or ignorance of its
> truth; (5) his intent that it should be acted upon by the
> person and in the manner reasonably contemplated; (6)
> the hearer's ignorance of its falsity; (7) his reliance on its
> truth; (8) his right to rely thereon; and (9) his consequent
> and proximate injury.

*M St. Investments, Inc. v. Zurich Am. Ins. Co.*, No. 3:13-CV-878 DCB MTP, 2014 WL

1326105, at *2 (S.D. Miss. Mar. 28, 2014) (citing *Levens v. Campbell,* 733 So. 2d 753,

761-62 (Miss. 1999); *KLLM Transp. Servs. v. Marsh USA, Inc.,* 450 F. App'x 406,

409 (5th Cir. 2011)); *Precision Spine, Inc. v. Zavation, LLC*, No. 3:15CV681-LG-

RHW, 2016 WL 866965, at *7 (S.D. Miss. Mar. 2, 2016) (citing *Koury v. Ready*, 911

So. 2d 441, 445 (Miss. 2005)).

In the context of contract formation, "omission or concealment of a material

fact can constitute fraud." *Morgan v. Green-Save, Inc.*, 2 So. 3d 648, 653 (Miss. Ct.

App. 2008) (citing *Rankin v. Brokman*, 502 So. 2d 644, 646 (Miss. 1987)). "[I]n order

to create liability for nondisclosure, the defendant's 'silence must relate to a material fact or matter known to the party and as to which it is his legal duty to communicate to the other contracting party.'" *Id.* (quoting *Mabus v. St. James Episcopal Church,* 884 So. 2d 747, 762-63 (Miss. 2004)).  Thus, "the parties must stand in a confidential or fiduciary relationship with one another" for such a legal duty to exist.  *Id.*  "To prove fraudulent concealment the plaintiff must show that the defendant 'took some action, affirmative in nature, which was designed or intended to prevent and which did prevent, the discovery of the facts giving rise to the fraud claim.'" *Id.* (quoting *Davidson v. Rogers,* 431 So. 2d 483, 485 (Miss. 1983)).

Regardless of whether Plaintiffs characterize Defendants' conduct as omission or concealment, injury proximately caused by Defendants' allegedly fraudulent actions remains an essential element of their claim.  The injuries they allege remain the same regardless of the theory of liability.  Therefore, Plaintiffs' fraud claim fails for the same reason that their other tort claims fail: they have not submitted evidence sufficient to create an issue of fact surrounding whether exposure to mold specifically caused the symptoms they experienced.  Without expert evidence of specific causation, Defendants are entitled to summary judgment on Plaintiffs' fraud claim.

x.    <u>Alter Ego is Not a Cause of Action</u>

Plaintiffs' alter ego allegations are not a cause of action, but simply a theory of liability.  *See EDW Invs., LLC v. Barnett*, 149 So. 3d 489, 492 (Miss. 2014).

Plaintiffs also concede this point by failing to address this argument in Defendants'

Motions to Dismiss. Any claim for "alter ego" is dismissed for failure to state a

claim.

        xi.    <u>Mississippi Does Not Recognize a Cause of Action for
Intentional Endangerment</u>

Defendants argue that intentional endangerment is not a cause of action

supported by any Mississippi case law. Indeed, Plaintiffs do not set forth the

elements for such a cause of action and do not respond to Defendants' contention in

their response briefing. The Court is not aware of any Mississippi cause of action

for "intentional endangerment." This claim should be dismissed for this reason

alone. However, to the extent that Plaintiffs allege that Defendants engaged in

intentionally tortious conduct causing injury due to mold exposure, such a claim

fails along with Plaintiffs other tort claims because Plaintiffs cannot establish

specific causation.

        xii.    <u>Plaintiffs' Cannot Defeat Summary Judgment by Alleging
Infliction of Emotional Distress in their Summary Judgment
Response Briefs for the First Time</u>

Plaintiffs assert claims for negligent infliction of emotional distress and

intentional infliction of emotional distress in their response briefing to Defendants'

summary judgment motions. (*See* Pls.' Resp. Opp. FCRM Mot. Summ. J. 28, ECF

No. 253; Pls.' Resp. Opp. Hunt Defs. Mot. Summ. J. 28, ECF No. 254.) This is the

first time Plaintiffs make these claims. Indeed, they are nowhere to be found in

Plaintiffs' [196] Amended Complaint, and Plaintiffs have not otherwise moved to

amend their pleadings to add these claims. "[T]he plaintiffs may not defeat

summary judgment on the basis of a theory found nowhere in their complaint, at least without also moving to amend or absent trial by consent." *Johnson v. Thibodaux City*, 887 F.3d 726, 736 (5th Cir. 2018); *see Crompton-Richmond Co., Inc.-Factors v. Smith*, 392 F.2d 577, 577-78 (3d Cir. 1967) (noting that a party could not raise an independent contract theory as a defense to summary judgment when that theory was never pleaded as a defense or counterclaim). The Court therefore cannot pass upon these new theories of liability. They will be dismissed.

## III. CONCLUSION

The Court has determined that Defendants are entitled to summary judgment on all of Plaintiffs' claims. To the extent that the Court has not specifically addressed arguments made in opposition to summary judgment, those arguments have been considered and they do not alter the Court's conclusions. Defendants' Motions for Summary Judgment will be granted. The remaining Motions will be denied as moot.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [229] Motion for Summary Judgment filed by Defendants Hunt Southern Group, LLC and Hunt MH Property Management, LLC and [234] Motion for Summary Judgment filed by Defendant Forest City Residential Management, LLC are both **GRANTED**. Plaintiffs' claims are **DISMISSED**. A final judgment will be issued.

**IT IS FURTHER ORDERED AND ADJUDGED** that all remaining pending motions are **MOOT**.

**SO ORDERED AND ADJUDGED** this the 12th day of September, 2019.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE